**Paul H. SMITH, et al., Petitioners,**

v.

**Thomas O'DONNELL, Executor of the Estate of Corwin Denney, Respondent.**

No. 07–0697.

Supreme Court of Texas.

Argued Sept. 10, 2008.

Decided June 26, 2009.

Casey L. Dobson, Paige Arnette Amstutz, Jane M.N. Webre, Scott Douglass & McConnico, L.L.P., Austin TX, for Petitioner.

Vincent L. Marable III, Paul Webb, P.C., Wharton TX, Brett Wagner, Mark W. Long, Larry J. Doherty, Doherty Long & Wagner, L.L.P., Houston TX, for Respondent.

Justice O'NEILL delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice BRISTER, Justice MEDINA, and Justice JOHNSON joined.

■ Thomas O'Donnell, as executor of the estate of Corwin Denney, sued Cox & Smith, Corwin's attorneys, for legal malpractice, breach of fiduciary duty, and gross negligence/malice arising out of advice the attorneys gave Corwin while he was serving as executor of his wife's estate. The trial court granted summary judgment for the attorneys on all claims. The court of appeals reversed the summary judgment on the legal malpractice claim based on our holding in *Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.,* 192 S.W.3d 780 (Tex.2006). 234 S.W.3d 135, 138. In *Belt,* we held that an executor was in privity with the decedent's attorneys and could sue them for estate-planning malpractice. 192 S.W.3d at 787. A prior case, *Barcelo v. Elliott,* 923 S.W.2d 575 (Tex.1996), barred estate-planning legal malpractice claims brought by third-party beneficiaries of the estate. This case asks us to consider whether an executor may bring suit against a decedent's attorneys for malpractice committed outside the estate-planning context. We hold that the executor should not be prevented from bringing the decedent's survivable claims on behalf of the estate, and affirm the court of appeals' judgment.

## I. Background

When Corwin Denney's wife, Des Cygne, died, Corwin served as executor of her estate. He retained Cox & Smith to advise him in the independent administration of her estate, and consulted the law firm regarding the separate versus community character of the couple's assets.

According to Corwin, he and his wife had orally agreed that stock in Automation Industries, Inc., would be his separate property and stock in Gilcrease Oil Co. would be hers. Cox & Smith prepared a memorandum advising Corwin that the Automation and Gilcrease stock was presumed to be community property, and that additional information was necessary before classifying the assets. According to Cox & Smith, Corwin was also advised that he should probably pursue a declaratory judgment to properly classify the stock, which he declined to do. Cox & Smith, relying upon an analysis performed by Corwin's California accountant and without seeking a declaratory judgment, prepared an estate tax return that omitted any Automation stock from a list of Des Cygne's assets. Corwin died twenty-nine years later, leaving the bulk of his estate to charity. Approximately one month after his death, the Denney children, as beneficiaries of Des Cygne's trust, sued Corwin's estate alleging that Corwin had misclassified the Automation stock as his separate property, and as a result underfunded their mother's trust. O'Donnell, the executor of Corwin's estate, settled the children's claims for approximately $12.9 million, less than half of their estimated value.[1] O'Donnell then brought this suit for legal malpractice against Cox & Smith, alleging that the attorneys failed to properly advise Corwin about the serious consequences of mischaracterizing assets, and that their negligence caused damage to Corwin's estate.

## II. Procedural History

At the trial court, Cox & Smith won a summary judgment on all claims. The trial court did not state a basis for its decision. The court of appeals initially affirmed the summary judgment, holding

that no cause of action had accrued to Corwin during his lifetime, and thus O'Donnell lacked privity with the lawyers. *O'Donnell v. Smith,* No. 04–04–00108–CV, 2004 WL 2877330, at *3 (Tex.App.-San Antonio Dec.15, 2004). We vacated and remanded for reconsideration in light of our decision in *Belt,* 192 S.W.3d 780. In *Belt,* we held that there was no accrual problem under similar circumstances. 192 S.W.3d at 785–86. There, the independent executrixes of an estate brought a legal malpractice claim on the estate's behalf alleging that a negligently-drafted will had increased the estate's tax liability. *Id.* at 782. We held that because the injury that formed the basis of the claim occurred when the will was drafted, the claim accrued prior to the decedent's death. 192 S.W.3d at 785–86. We further held that legal malpractice claims for pure economic loss are survivable and an estate's personal representative may bring survivable claims on behalf of the estate. *Id.* at 785–87.

In this case, the court of appeals held, on remand, that (1) a fact issue existed as to whether a malpractice cause of action accrued during Corwin's lifetime; (2) such a claim would survive in favor of the estate; and (3) no evidence supported O'Donnell's malice claim. 234 S.W.3d at 145–48. Cox & Smith argued to the court of appeals that despite our holding in *Belt,* the summary judgment should have been affirmed because O'Donnell lacks privity with Cox & Smith. Cox & Smith based its argument on *Barcelo,* 923 S.W.2d 575, in which we held that estate-planning attorneys owe no duty to third-party beneficiaries, and are not subject to malpractice lawsuits brought by them. Cox & Smith contends legal malpractice claims cannot be brought by anyone but the client, and *Belt* merely created a narrow exception for

---

1. According to O'Donnell's attorney, the Des Cygne beneficiaries' claims against Corwin were worth at least $32 million and perhaps as much as $40 million.

executors bringing estate-planning legal malpractice claims. The court of appeals rejected this argument, and we consider it here.

### III. Privity Between Attorneys and Executors of the Client's Estate

■ An executor is a personal representative who "'stands in the shoes'" of the decedent. *Belt*, 192 S.W.3d at 787. As a general rule, an estate's personal representative may bring the decedent's survivable claims on behalf of the estate. *Id.* at 784; *see also* TEX. PROB.CODE § 233A ("Suits for the recovery of personal property, debts, or damages . . . may be instituted by executors or administrators."). In *Belt*, we considered whether the executrixes' legal malpractice claim was survivable. 192 S.W.3d at 784. At common law, actions for damage to real or personal property survive the death of the owner. *Id.* Thus, we held that "legal malpractice claims alleging pure economic loss survive in favor of a deceased client's estate." *Id.* at 785.

Having identified these claims as survivable, we must consider whether there is any reason for an exception preventing executors from bringing them. Cox & Smith again relies on our holding in *Barcelo*, where we identified the longstanding privity rule barring non-clients from suing for legal malpractice. 923 S.W.2d at 577. In that case, the beneficiaries of a will and a trust agreement sued the estate-planning attorney for legal malpractice, alleging that negligent drafting had harmed their interests. *Id.* at 576. We refused to join the majority of states that relax the common-law privity barrier for intended beneficiaries, and held that third parties lack privity with a deceased's attorney and cannot sue for malpractice. *Id.* at 577–79.

We identified two policy considerations that supported our decision in *Barcelo*. First, allowing these suits could disrupt the attorney-client relationship. If third parties could sue for estate-planning legal malpractice, attorneys would be distracted by the threat of future lawsuits from disgruntled heirs, making them less able to serve their clients. *Id.* at 578. Second, third-party estate-planning malpractice suits would allow disappointed beneficiaries to seek a greater share of the estate by claiming the testator's true intent was different from what is expressed in a formally-executed will, and thus create "a host of difficulties." *Id.*

Cox & Smith contends *Barcelo* bars all legal malpractice suits brought by non-clients, with the exception of estate-planning malpractice claims brought by executors, like that in *Belt*. To adopt the rule Cox & Smith suggests would place us alone among the states, and would unnecessarily immunize attorneys who commit malpractice. None of the concerns we voiced about third-party malpractice suits apply to malpractice suits brought by an estate's personal representative. The threat of executor lawsuits will not impede the attorney-client relationship, because the estate's suit is based on injury to the deceased client, as opposed to any third party. The estate's suit is identical to one the client could have brought during his lifetime. An estate's interests, unlike a third-party beneficiary's, mirror those of the decedent. *Belt*, 192 S.W.3d at 787.[2]

---

**2.** In *Belt*, we noted that several considerations should discourage beneficiaries who also act as an estate's personal representative from pursuing estate-planning malpractice claims in order to increase their own shares. First, mismanagement could subject the personal representative to removal. *Belt*, 192 S.W.3d at 787–88 (citing TEX. PROB. CODE § 222(b)(4)). Second, any damages recovered would be paid to the estate, then distrib-

Cox & Smith argues that the estate's interest in this suit is not truly in line with the decedent's because Corwin had always intended to keep the community-property stock out of the trust and treat it as his own property, and he did so without seeking the declaratory judgment Cox & Smith recommended.[3] This argument, though, goes to the weight of the legal malpractice claim and does not change the fact that O'Donnell "stands in the [deceased's] shoes" in assessing the claim's merit and deciding whether or not to assert it on the estate's behalf. *Id.* Of course, if the evidence demonstrates that Corwin would have ignored Cox & Smith's advice no matter how competently provided, the malpractice claim will fail for lack of proximate causation. But at this point in the proceedings, the merits of the malpractice claim are undeveloped. There is at least some evidence that Corwin would have followed his lawyers' advice to pursue a declaratory judgment if they had clearly advised him to do so or warned him adequately of the severe consequences of mischaracterizing community assets.

And although Cox & Smith suggests, and the dissenting justices assume, that O'Donnell colluded with the Denney children in settling their claims, there is nothing in the record that would support such a presumption. If Cox & Smith can in fact demonstrate collusion at trial, it would presumably negate causation and/or mitigate damages on the legal malpractice claim, and could subject O'Donnell to personal liability to Corwin's beneficiaries for violating his fiduciary duties as executor of Cor-

win's estate. We see no reason to create a rule that would deprive an estate of any remedy for wrongdoing that caused it harm by prohibiting the estate from pursuing survivable claims the decedent could have brought during his lifetime.

Cox & Smith argues that the court of appeals' decision creates an end-run around *Barcelo*, allowing disgruntled beneficiaries to sue to increase their inheritances. However, the Des Cygne beneficiaries' claims were not against Corwin's estate as beneficiaries of his will, but against Corwin as executor of their mother's estate. Had they known during his lifetime that Corwin had misallocated their mother's community property and brought suit while he was alive, as the dissenting justices say they should have, any judgment or settlement they might have obtained for damage to their mother's estate would have been collectable from Corwin, who then could have asserted a claim against Cox & Smith for legal malpractice. In such a case, under Cox & Smith's and the dissenting justices' view, *Barcelo* would extinguish Corwin's malpractice claim upon his death simply because the Des Cygne beneficiaries were also beneficiaries of Corwin's estate. We do not believe *Barcelo* will bear such an expansive reading. To the contrary, when negligent legal advice depletes the decedent's estate in a manner that does not implicate how the decedent intended to apportion his estate, *Barcelo's* concerns about quarreling beneficiaries and conflicting evidence do not arise. *See Barcelo*, 923 S.W.2d at 578.

---

uted according to the existing estate plan. *Id.* at 788. These concerns are not present here because O'Donnell is not a beneficiary of Corwin's will or Des Cygne's, and furthermore, the claim is not for estate-planning malpractice.

**3.** The dissent asks, "would the client be rooting for the executor and the beneficiaries?"

The answer is almost certainly yes. The Des Cygne beneficiaries received fixed amounts under Corwin's will. The only beneficiaries that stand to benefit from the suit against Cox & Smith are the charity to which Corwin intended to leave the bulk of his estate and possibly Corwin's widow.

Here, the beneficiaries of Des Cygne's trust do not dispute Corwin's intent as expressed in his will. They have already been paid a settlement out of Corwin's estate for damage Corwin allegedly caused to their mother's trust; the outcome of O'Donnell's legal malpractice suit against Cox & Smith will have no impact on their recovery, and they have no interest in that suit.

Adopting the broad rule Cox & Smith proposes would preclude executors from recovering for any claims the estate has to pay potential beneficiaries due to bad legal advice the decedent received during his lifetime. For example, according to Cox & Smith and the dissenting justices, if Corwin had improperly handled co-owned property based on bad legal advice and then died, his estate would be liable to the co-owner and could sue for legal malpractice so long as the co-owner was not related to Corwin and therefore a potential beneficiary of his estate. If a judgment was entered against Corwin because counsel botched his defense in a personal injury action arising out of an automobile accident, and Corwin later died, his estate could not assert a malpractice claim for damages that his estate must pay if the injured party happened to be a beneficiary of his will. We see no reason to extend the *Barcelo* privity bar to survivable malpractice suits brought by an executor, and declined to do so in *Belt*. We do not read *Barcelo* to bar O'Donnell's suit against Cox & Smith.

The dissent contends our decision will somehow allow disgruntled beneficiaries to employ gamesmanship to recover more than they were devised and will open up new avenues for attorney liability. Under *Barcelo*, beneficiaries cannot sue a decedent's attorneys for estate-planning malpractice. *Id.* at 579. But this case does not involve a claim of estate-planning mal-

practice and it does not involve a suit by a decedent's beneficiaries against the decedent's attorneys. The Des Cygne beneficiaries did not sue Corwin's attorneys and have no interest in the outcome of the legal malpractice case. They did sue Corwin's estate, but did so in their capacity as the wronged beneficiaries of their mother's allegedly underfunded trust, not as disgruntled beneficiaries of Corwin's will. We see no reason to bar a completely separate lawsuit—that of the executor against Corwin's attorneys—simply because Des Cygne's beneficiaries sued the estate for Corwin's mishandling of their mother's trust.

## IV. Malice

■ O'Donnell has filed a cross-petition challenging the court of appeals' holding that O'Donnell presented no evidence of malice to support an award of exemplary damages. *See* Act of Apr. 11, 1995, 74th Leg., R. S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 110 (amended 2003) (current version at TEX. CIV. PRAC. & REM.CODE § 41.003(a)). Malice has both an objective and a subjective prong; proof of malice involves an objective determination that the defendant's conduct involves an extreme risk of harm, and a subjective determination that the defendant had actual awareness of the extreme risk created by his conduct. *Kinder Morgan N. Tex. Pipeline, L.P. v. Justiss*, 202 S.W.3d 427, 447 (Tex.App.-Texarkana 2006, no pet.).

■ The objective prong is a function of both the magnitude and the probability of potential injury and is not satisfied if the defendant's conduct merely creates a remote possibility of serious injury. *Universal Servs. Co. v. Ung*, 904 S.W.2d 638, 641 (Tex.1995). "Extreme risk" is not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff.

*Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 785 (Tex.2001). The subjective prong requires evidence that the defendant was subjectively aware of the risk but consciously chose to do nothing. *Lee Lewis,* 70 S.W.3d at 786.

■ In reviewing a no-evidence summary judgment, we review the evidence in the light most favorable to the respondent against whom the summary judgment was rendered. *City of Keller v. Wilson,* 168 S.W.3d 802, 824 (Tex.2005). If the respondent brings forth more than a scintilla of probative evidence to raise a genuine issue of material fact, a no-evidence summary judgment cannot properly be granted. *Reynosa v. Huff,* 21 S.W.3d 510, 512 (Tex. App.-San Antonio 2000, no pet.).

■ O'Donnell argues that he introduced more than a scintilla of evidence on both the objective and subjective prongs. We agree with the court of appeals that the strict standard for proving malice was not met. The evidence O'Donnell offered to prove that there was an extreme risk of harm amounts to conclusory statements from his expert and Corwin's California counsel. Similarly, the evidence raises no fact issue that Cox & Smith intended to cause Corwin injury or acted with actual awareness of an extreme risk of injury. Cox & Smith recognized that classifying the property was important, and informed Corwin that it was "presumably community," and that more information was needed to classify it properly. Cox & Smith also advised him that he should "probably" seek a declaratory judgment on the classification.

■ O'Donnell argues that it was inappropriate for the court of appeals to consider this evidence of "some care" exercised by Cox & Smith, because "some care" will not carry the burden on a no-evidence summary judgment. But the court of appeals is charged with considering "*all* the evidence" in reviewing punitive damage issues. *City of Keller,* 168 S.W.3d at 817 (emphasis in original). Moreover, we have held that in reviewing a summary judgment on malice, courts should consider "all of the surrounding facts, circumstances, and conditions" in deciding whether an action was pursued with conscious indifference to risk. *Burk Royalty Co. v. Walls,* 616 S.W.2d 911, 922 (Tex.1981).

■ The court of appeals did not err in considering evidence that Cox & Smith had in fact made some attempt to point Corwin down the path of correctly classifying the stock. Considering all the evidence, there is nothing to suggest that Cox & Smith had any intent to harm Corwin or consciously chose to not give him more detailed advice, and thus the court of appeals did not err in affirming the no-evidence summary judgment on malice.

## V. Conclusion

For the foregoing reasons, the court of appeals' judgment is affirmed.

Justice WILLETT filed a dissenting opinion, in which Justice WAINWRIGHT joined.

Justice HECHT and Justice GREEN did not participate in the decision.

Justice WILLETT, joined by Justice WAINWRIGHT, dissenting.

This legal-malpractice appeal turns on whether *Belt*[1] or *Barcelo*[2] should control. Decided a decade apart, both decisions have their place in our jurisprudence—*Barcelo* states the general rule (non-clients

---

1. *Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.,* 192 S.W.3d 780 (Tex.2006).

2. *Barcelo v. Elliott,* 923 S.W.2d 575 (Tex. 1996).

cannot file malpractice suits), *Belt* the exception (executors sometimes can). Unlike the Court, I believe today's case is governed by *Barcelo's* general privity barrier, as it is rife with *Barcelo*—like concerns of divided loyalties and conflicts of interest. Indeed, this case presents exactly the sort of gamesmanship flagged in *Belt*, "an opportunity for some disappointed beneficiaries to recast a malpractice claim for their own 'lost' inheritance, which would be barred by *Barcelo*, as a claim brought on behalf of the estate." [3]

A lawyer's focus should be stubbornly client-focused, concerned with today's representation of satisfied clients, not tomorrow's litigation from dissatisfied critics. The Court's decision, I fear, sends this troubling message: *caveat advocatus*— zealously represent your client at your own risk. It's hard to be zealous while nervous. For the concerns expressed in *Barcelo* (and echoed in *Belt*), I would affirm the trial court's summary judgment for Cox & Smith.

## I. *Barcelo* and *Belt* Revisited

Barcelo held that trust beneficiaries lacked privity with the trustor's attorney and therefore had no claim for legal malpractice.[4] The Court reaffirmed the general Texas rule that an attorney's professional duty of care extends only to his client, and declined to recognize an exception to the privity barrier applicable "in the estate planning context." [5] The Court's chief rationale was that relaxing the privity rule might create conflicts of interest that would discourage lawsuit-wary attorneys from acting solely and zealously on behalf of their clients:

Such a cause of action would subject attorneys to suits by heirs who simply did not receive what they believed to be their due share under the will or trust. This potential tort liability to third parties would create a conflict during the estate planning process, dividing the attorney's loyalty between his or her client and the third-party beneficiaries....

....

We believe the greater good is served by preserving a bright-line privity rule which denies a cause of action to all beneficiaries whom the attorney did not represent. This will ensure that attorneys may in all cases zealously represent their clients without the threat of suit from third parties compromising that representation.[6]

In *Barcelo*, we did not identify an actual conflict of interest between the third-party beneficiaries and the attorney. Our decision to adopt a bright-line rule must therefore be read as based on the mere *possibility* of conflicts of interest between the client trustor or testator and the third-party beneficiary.

Belt, on the other hand, held that independent executors of an estate could sue an estate-planning attorney for injury to the estate as a whole.[7] The alleged injury to the estate in Belt was a substantial and avoidable estate-tax liability.[8]

A critical distinction between *Belt* and *Barcelo* is that in *Belt* the interests of the testator, the estate, the executors, and the heirs were aligned. In *Belt*, we respected and reconciled *Barcelo* by emphasizing that the potential conflicts of interest that

3. *Belt,* 192 S.W.3d at 788.

4. *Barcelo,* 923 S.W.2d at 578–79.

5. *Id.* at 577.

6. *Id.* at 578–79.

7. *Belt,* 192 S.W.3d at 782.

8. *Id.*

concerned us in that case were absent in *Belt*:

[I]n *Barcelo*, we held that an attorney's ability to represent a client zealously would be compromised if the attorney knew that, after the client's death, he could be second-guessed by the client's disappointed heirs. Accordingly, we held that estate-planning attorneys owe no professional duty to beneficiaries named in a trust or will.

While this concern applies when disappointed heirs seek to dispute the size of their bequest or their omission from an estate plan, it does not apply when an estate's personal representative seeks to recover damages incurred by the estate itself. Cases brought by quarreling beneficiaries would require a court to decide how the decedent intended to apportion the estate, a near-impossible task given the limited, and often conflicting, evidence available to prove such intent. In cases involving depletion of the decedent's estate due to negligent tax planning, however, the personal representative need not prove how the decedent intended to distribute the estate; rather, the representative need only demonstrate that the decedent intended to minimize tax liability for the estate as a whole.

Additionally, while the interests of the decedent and a potential beneficiary may conflict, a decedent's interests should mirror those of his estate. Thus, the conflicts that concerned us in *Barcelo* are not present in malpractice suits brought on behalf of the estate.[9]

## II. The *Barcelo* Privity Barrier Should Govern this Case

Today's case should fall under the *Barcelo* privity barrier because conflicts of interest abound. While this case has a slightly altered procedural posture-suit filed by the executor, not the beneficiaries directly-there is little confusion that the executor is a pass-through, essentially bringing the children's claims in the estate's name. The trust beneficiaries had interests that directly conflicted with the interests of Corwin Denney, the client. The trust was established at the death of Denney's second wife, Des Cygne, pursuant to her will. Every asset that went into Des Cygne's trust was an asset that Denney could not treat as his separate property and spend or otherwise use as he wished. *Barcelo's* central holding is that this conflict of interest necessarily means that trust beneficiaries do not share privity with the client's attorneys, who should focus solely on the client's best interests and wishes.

The trust beneficiaries, Denney's children, could have sued Denney during his lifetime for failing to adequately fund Des Cygne's trust with her rightful share of the couple's community property. The beneficiaries declined to do so, almost surely aware that Denney would have vigorously contested any characterization of the Automation Industries stock as community property and that he would have offered evidence of an oral agreement with Des Cygne that all the stock was his separate property. Nor did the beneficiaries sue Denney's attorneys after Denney's death. If they had, they would have lost under *Barcelo*. Instead, they waited thirty-four days after their father died and sued his estate. The executor, O'Donnell, raised no limitations defense but instead settled with the beneficiaries for generous sums.[10] He then sued Cox & Smith for

---

9. *Id.* at 787 (footnote and citations omitted).

10. Affidavits submitted by the executor's experts assert that Denney failed to fund Des Cygne's trust with Automation Industries

malpractice, essentially taking the position that Denney's attorneys should have persuaded him, against his strong and repeated wishes, to surrender more assets to Des Cygne's trust. So we have a *Barcelo* suit draped in *Belt* garb. I would disallow the legal makeover.

The record is clear that Denney believed that all the Automation Industries stock was his separate property and that he opposed funding the trust with this prized asset. O'Donnell, with nothing to win or lose personally by settling with the trust beneficiaries, has now become a conduit for the trust beneficiaries' claim that Denney should have been more generous to the trust and less generous to himself. Under *Barcelo*, attorneys should not be forced to answer such claims. The privity rule should preempt lawsuits where the executor effectively serves as a pass-through for the beneficiaries' claims.

### III.  A Bypass Suit for Every Bypass Trust?

Because of the conflicts of interest inherent in expecting an attorney to safeguard the interests of clients and beneficiaries alike, claims by disappointed beneficiaries would discourage attorneys from focusing solely on the client's best interests, the essential teaching of *Barcelo*. I see no special significance to the fact that the beneficiaries here were beneficiaries to a trust that was not created by Denney's will. *Barcelo* also

concerned a separate trust that allegedly was not properly funded.[11] Regardless, the critical similarity with *Barcelo* is that the interests of the beneficiaries whose claims led to the malpractice suit were not necessarily aligned with the interests of the deceased client, and the mere risk of divided loyalties compelled us to maintain a bright-line privity barrier that precluded legal malpractice suits filed by third parties.

I would not read *Belt* to apply whenever third parties manage to bring suit against the estate instead of the attorneys or the client directly. Again, the trust beneficiaries here could have brought suit against Denney or his attorneys but declined to do so. In *Barcelo*, the disappointed trust beneficiaries apparently could have pursued litigation against the executor of the client's estate, but instead settled with the estate "for what they contend[ed] was a substantially smaller share of the estate than what they would have received pursuant to a valid trust."[12] Bypass trusts and other trusts are extremely common estate planning devices for couples wishing to minimize taxes or serve other estate planning goals.[13] As happened here, the beneficiaries to the trust created by the will of the first spouse to die may have to wait until the surviving spouse dies, since the surviving spouse typically receives income from the trust until death, and the corpus of the trust then goes to the beneficiaries.

---

stock worth approximately $1.8 million at the time of her death, resulting in claims by the trust beneficiaries that O'Donnell settled years later for over $12.86 million. O'Donnell also paid the estate counsel who advised him $2.3 million for eight months of work that included one deposition.

11.  *Barcelo*, 923 S.W.2d at 576.

12.  *Id.*

13.  *See, e.g., Stoll v. Henderson*, 285 S.W.3d 99, 100 (Tex.App.-Houston [1st Dist.], no pet. h.); *In re Townley Bypass Unified Credit Trust*, 252 S.W.3d 715, 718–19 (Tex.App.-Texarkana 2008, no pet.); *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 733 (Tex.App.-San Antonio 2007, pet. denied); *Rosen v. Wells Fargo Bank Texas, N.A.*, 114 S.W.3d 145, 148 (Tex.App.-Austin 2003, no pet.); *id.* at 155–56 (Kidd, J., dissenting) (describing bypass trust); *Guest v. Cochran*, 993 S.W.2d 397, 399–400 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

If *Barcelo* can be circumvented in three simple steps—(1) beneficiaries sue the estate to resolve an objection to how the trust was funded or created; (2) executor settles with the beneficiaries; (3) executor then recoups the settlement by suing the attorneys who long-ago advised one or both spouses—*Barcelo's* privity bar will prove porous indeed. I would limit *Belt* to cases where the court can safely assume that the interests of the client, the executor, and the disappointed heir or trust beneficiary are plainly and truly aligned, a situation we manifestly do not see here.

Further, if the only prerequisite to suit against a deceased client's attorney is that it must be brought by the executor, an endless variety of claims could be brought on the theory that the attorney's advice resulted in a smaller estate or trust. Every lawyer who advised a client to plead guilty or not, file for bankruptcy or not, settle a dispute or not, incorporate a business or not, and so on, would be fair game. I suspect that many experienced estate-planning attorneys have encountered a client who plans to "breathe his last breath and spend his last dollar," and who wishes not to be bothered with the paperwork, expense, meetings, or loss of control over assets involved in maximizing his estate. Today's decision arguably places a duty on attorneys to dissuade such a client from his carefree inclinations, and to steer him instead to altruism, a task, in my view, better left to those with divinity degrees instead of law degrees.

The distinction between this case and *Belt* is best captured with this question: would the client be rooting for the executor and the beneficiaries? In *Belt* we assumed the answer was "yes" so long as the client wanted his estate-tax liability minimized, thus leaving more to the chosen heirs. As the interests of the client-testator, estate, executor, and heirs were perfectly aligned, extending privity from the client to the executor made perfect sense.

In today's case, a "yes" answer is less clear. To put it mildly, the record does not suggest that Denney would be rooting for the trust beneficiaries, his six children, whom he wanted to inherit only nominal sums from himself and Des Cygne, with the bulk of his estate going to charity.[14]

14. The flavor of the relationship between Denney and his children is provided in a letter Denney wrote to daughter Carolyn in 1979, a copy of which was sent to all his children, in which he made clear that he wanted his children only to inherit modest amounts:

> As I look back over my life, I feel extremely fortunate to have been able to have started with absolutely nothing and end up with the potential, in some small way, to contribute to the world....
> Now, I would like to discuss with you, each of my children, with your having the knowledge that each will receive a copy of this letter.
> ... DesCygne and I made the trip to pay a visit on more than one occasion with your extending less than a warm welcome to DesCygne.... As I recall, not too many months later, you insisted that you be given a wedding almost immediately. Your mother was very much opposed to the wedding, but I sanctioned same, only because of my suspicion of the nature of the urgency, which later became substantiated.
> As you know, I soon became suspicious that [son in law] Gerry would never amount to anything.... The culmination of these episodes was the asking by you and Gerry that I loan to you $10,000.00 for the purchase of a gasoline filling station. The result, of which, was a complete squandering of the money.
> ....
> ... DesCygne was very aware of the hatred you, [daughter] Mary, and [daughter] Anne felt for her.... DesCygne's estate was only nominal, and resulted exclusively from what I had given to her.... In my will, there is an equally nominal amount to be divided equally between the six children....

The California suit by the children directly precipitated the Texas legal malpractice suit. *Barcelo* endeavored to bar legal-malpractice suits by beneficiaries with a bright-line rule because conflicts might arise due to "concomitant questions as to the true intentions of the testator." [15] *Belt* distinguished cases "when disappointed heirs seek to dispute the size of their bequest," [16] and where the attorneys are being "second-guessed by the client's disappointed heirs," [17] the situation here.

Cox & Smith advised Denney regarding Des Cygne's trust and her estate-tax filing. In the course of this advice the Cox & Smith attorneys advised Denney that the Automation Industries stock might, depending on choice-of-law questions, be deemed community property despite Denney's written representation to the attorneys that "DesCygne and I had a firm understanding that she had no interest in my stock in [Automation Industries]." Cox & Smith recommended that Denney seek a declaratory judgment regarding the proper characterization of the stock, but he refused, and instead "made a decision that it ... was his separate property," according to the testimony of Cox & Smith attorney Jack Guenther. Denney always believed that the Automation Industries stock was his separate property, as he started the company in the 1940s, long before he married Des Cygne. Throughout his lifetime—through Des Cygne's death, three divorces, and a stock sale while married to his fifth wife—Denney insisted the stock was his alone. O'Donnell's testimony confirms Denney's consistent position for thirty years was "that he, not any of his wives, owned all the Automation Industries stock."

At bottom, the legal-malpractice claim is that Cox & Smith should have persuaded Denney to do something he believed was wrong and did not want to do. Denney's lawyers should not be subject to suit, decades after their representation, for implementing their client's express wishes to live out his life as a wealthier man, based

---

... I know you abhor the thought of getting a job....

I was violently opposed to Mary marrying Gary; however, I gave them the best of weddings in Tulsa. Mary, was no better than you, in her hatred of DesCygne....

....

... Anne is the only one of my children who has ever visited me....

With regard to [sons] Tommy and Pete, both of them were terrible problems for the several years following DesCygne's death. These problems involved rebellion against all moral standards, consumption of drugs, inabilities to hold a job, scrapes with the law, and squandering of money....

....

With regard to [daughter] Deci, as you know, she has achieved an extremely poor academic record every school year. We still do not believe that this record is caused by anything other than a complete lack of application and a selfish desire to do ever what she wants.... Her use of drugs and alcohol has contributed to her downfall....

....

At the time Deci made her decision, I explained to her that she was not going to inherit, except in a very nominal way, from her mother or me....

....

Finally, I would like for you and the others to know, that upon my death the vast majority of my assets will go to the Denney Foundation.

Denney's last wife Nanci, in a deposition, summarized the suit that Denney's "horrible, odious, unattractive, disagreeable" children brought against the estate as follows: "They called him a liar and a fraud and a cheat. And I never understood why they really did it. I think they just wanted to get more money than he had left them."

**15.** *Barcelo*, 923 S.W.2d at 578.

**16.** *Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 787 (Tex.2006).

**17.** *Id.*

on a then-defensible position that the stock was indeed his separate property and did not belong in Des Cygne's trust. The privity rule serves to tell lawyers in this situation to fight for Denney, not against him, and try to assure that he gets to keep his stock.

This case presents a conflict between client and trust beneficiary (Denney and his children) and also requires a presumption, against all record evidence, that Denney would cheer his estate's decision to settle with the children (who wanted the millions that Denney instead gave to charity) and then sue Cox & Smith for having carried out his wishes. Unlike the facts in *Belt*, what most benefits the living client who received the legal advice (treating the stock as separate property) and what the executor thought was in the estate's best interest (paying millions to settle claims that the stock was community property) are contradictory. These conflicting, misaligned interests were not present in *Belt*.

## IV. Conclusion

On these facts, we cannot indulge *Belt*-like presumptions that Denney's interests while living "mirror those of his estate,"[18] that the estate's interests "are compatible with the client's interests,"[19] or that Denney would want to see his executor "standing in his shoes"[20] by suing the attorneys whose work Denney praised. O'Donnell is trying to squeeze into Denney's shoes, but the fit is quite uncomfortable, and the Court should not allow it.

---

18. *Id.*

19. *Id.* at 789.

20. *See id.* at 787 ("the estate 'stands in the shoes' of a decedent"); *id.* at 788–89 (noting that estate "merely 'stands in the shoes' of the client after death").