

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-09-238-CV

RYAN ESQUIVEL

APPELLANT

V.

JPM REALTY PROPERTY
MANAGEMENT, INC. AND
JPM REALTY INVESTMENTS, INC.

APPELLEES

------------

## FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In two issues, Appellant Ryan Esquivel appeals the trial court's grant of

summary judgment for Appellees JPM Realty Property Management, Inc. and JPM

Realty Investments, Inc. (collectively "JPM"). We affirm.

---

[1] *See* Tex. R. App. P. 47.4.

## II. Procedural Background

Esquivel sued JPM, Avery Pointe apartment complex's management firm, for premises liability after he was injured in Avery Pointe's pool area—to wit, while a guest in the pool area, the "seat slab" of a concrete bench fell on his hand. Among other grounds, JPM moved for summary judgment on the ground that there was no evidence that it knew of the allegedly dangerous condition. Esquivel attached the following to support his response: his deposition; the affidavit of Jack Shatley, one of the owners of Tex-Art Stone, Inc., which manufactured and installed the concrete bench; the deposition of Ljudmilla Corral, an Avery Pointe tenant; photographs of the pool area and the bench; and the affidavit of Edward Esquivel, his father.[2] The trial court granted summary judgment for JPM.

## III. Summary Judgment

In two issues, Esquivel complains that he produced more than a scintilla of probative evidence in response to JPM's summary judgment grounds and that his comparative negligence is a fact question for the jury that precludes summary judgment.

## A. Standard of Review

After an adequate time for discovery, the party without the burden of proof may, without presenting evidence, move for summary judgment on the ground that

---

[2] JPM also attached Esquivel's and Corral's depositions and the Shatley affidavit to its motion.

there is no evidence to support an essential element of the nonmovant's claim. Tex. R. Civ. P. 166a(i). The motion must specifically state the elements for which there is no evidence. *Id.*; *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a genuine issue of material fact. *See* Tex. R. Civ. P. 166a(i) & cmt.; *Hamilton v. Wilson*, 249 S.W.3d 425, 426 (Tex. 2008).

When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We review a no-evidence summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Hamilton*, 249 S.W.3d at 426 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus., Inc.*, 286 S.W.3d at 310 (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009).

The trial court did not specify any grounds in its final judgment.[3] When a trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, summary judgment will be affirmed on appeal if any of the theories presented to the trial court and preserved for appellate review are meritorious. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003); *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995).

## B. Premises Liability

To succeed on a premises liability claim, an invitee must prove that (1) a condition of the premises created an unreasonable risk of harm to the invitee; (2) the owner knew or reasonably should have known of the condition; (3) the owner failed to exercise ordinary care to protect the invitee from danger; and (4) the owner's failure was a proximate cause of injury to the invitee. *Fort Brown Villas III Condo. Ass'n, Inc. v. Gillenwater*, 285 S.W.3d 879, 883 (Tex. 2009). If the owner or occupier did not create the condition, it must have existed long enough for the owner or occupier to have a reasonable opportunity to discover it—the "temporal element" of premises liability. *See Wal-Mart Stores, Inc. v. Reece*, 81 S.W.3d 812, 814 (Tex. 2002); *see also Hunnicutt v. Dallas/Fort Worth Int'l Airport Bd.*, No. 02-08-00297-CV,

---

[3] The trial court issued a letter ruling prior to issuing its judgment, stating, I have completed my review of plaintiff's evidence in response to defendants' "no-evidence" motion for summary judgment and find that there is (1) no evidence of a dangerous condition and (2) no evidence that the owner-occupier of the premises had actual or constructive knowledge of a dangerous condition; therefore, defendants' motion for summary judgment is granted.

2009 WL 2356858, at *2 (Tex. App.—Fort Worth July 30, 2009, pet. denied) (mem. op.) ("'[T]here must be some proof of how long the hazard was there before liability can be imposed on the premises owner for failing to discover and rectify, or warn of, the dangerous condition.'").

## C. Summary Judgment Evidence

No one disputes that Esquivel was an invitee or that his injury involved a large concrete bench comprised of a curved seat supported by two pedestals. Photographs reveal that this bench and two others of the same design were grouped around a table in the Avery Pointe swimming pool area.

### 1. Esquivel's Deposition

Esquivel testified that on July 31, 2005, he and two other teenagers, one of whom was an Avery Pointe tenant, spent around two hours in the pool area where the bench was located. An eight- or nine-year-old boy and his mother were there at the same time—the boy had a "water noodle" that he used to hit Esquivel. Esquivel stated that he and the others did not run in the pool area; he also testified, "I did not run at—directly at the bench." When he decided to get out of the pool, "the boy followed me, you know, hitting me repeatedly [with the water noodle] and I approached the bench and I told the boy, okay, that's enough. And I attempt[ed] to sit down on the bench, but next thing I know that happened, it just collapsed and past that I don't really remember much." As soon as he made contact with the bench, it collapsed onto his right hand.

5

Esquivel claimed that his father inspected the other benches on the day of the accident and told him "that they [the seats] did not come off like this one did" and "that there was some kind of adhesive on the bottom of the bench to keep it in place." Esquivel stated that all of the benches looked the same that day, that he had no way of knowing that this particular bench was going to collapse, and that he did not know if the apartment complex knew about "the allegedly dangerous condition."

Two photos were included with Esquivel's deposition—when asked who took them, he stated, "I imagine my father." He did not know when the photos were taken. One photo shows the top of the bench on the ground, leaning against the two pedestals. The other shows the bench put back together and indistinguishable from the other two benches nearby.

### 2. Shatley's Affidavit

Shatley stated in his affidavit that he was one of the owners of Tex-Art Stone, Inc., which manufactures and installs concrete benches. Prior to July 2005, Tex-Art Stone manufactured and installed several concrete table and bench sets in the Avery Pointe swimming pool area. He asserted,

> These benches were properly set up at the time of delivery. I am not aware of any defect in the concrete benches manufactured by Tex-Art Stone, Inc. that were sold to Avery Pointe. . . . In addition, on 8-13-08, I personally inspected the concrete benches in the swimming pool area at Avery Pointe and found them to be set up properly at that time.
>
> I have reviewed a copy of [Esquivel's petition and his deposition]. There has never [sic] an incident reported to Tex-Art Stone, Inc. in which a concrete bench seat has collapsed as described by Ryan

6

Esquivel in [his petition and deposition]. In addition, I have been actively employed in this industry for more than 30 years. Assuming that the bench in question was positioned adequately, it is my opinion that the bench seat could not have collapsed as described by Ryan Esquivel in his [deposition and petition].

### 3. Corral's Deposition

Corral testified that she had lived at Avery Pointe since 2003. On July 31, 2005, she and her son were in the pool area when two boys[4] a couple of years older than her son were there. Prior to the accident, her son played with them. Corral described the playing as running and kicking each other outside of the pool, splashing in the pool, and picking up her son and throwing him in the water—roughhousing, essentially—"up to the point when [she] asked them to quit playing with her son" because she did not want him to get hurt. The boys respected her request, and she left the pool area to join some friends outside the pool area. She could see the boys continue to run around the pool area from her vantage point outside the pool area—they would get out of the pool and then run to jump back into the pool. The accident occurred between thirty minutes to an hour later.

Corral testified that she was looking at the pool from outside the pool area and saw the boys running—the reason she was looking at the pool was because "[she] was continuously telling them, quit running." Esquivel slipped and then she heard

---

[4] After Corral reviewed a statement from her earlier interview about the incident, she saw that she had said that there were three teenaged boys. She said it was possible that there were three boys instead of two—three years had passed since the accident.

a loud noise "[l]ike somebody fell." She did not see the accident occur, but her son explained to her what had happened because he had remained in the pool area when she left. Corral testified that her son "told [her] that boys were running and the boy, [Esquivel], he slipped. And when he slipped his feet pushed the—the standing—the side of the bench, he pushed in, and the top fell on his hand when he was falling down." When she arrived in the pool area, she saw Esquivel, who was screaming, sitting on the ground and holding his hand. His feet were toward the bench, and the top of the bench was on the ground.

Corral subsequently gave a statement in around 2006 to someone at the apartment manager's office. Esquivel's counsel produced three pages of notes from that interview.[5] After she reviewed the interview notes, she stated that everything but the following appeared to be correct:

> I cannot recall 100% what did I told [sic] to that gentleman. But I don't believe I said the bench is unstable, because the bench is very heavy. And that's—it takes really big force to knock it over. So I don't believe I ever mentioned unstable bench. Or something like calling it hazardous.[6]

---

[5] The statement was included as a deposition exhibit.

[6] The notes reflect that she stated

> that the bench is a large heavy concrete bench and she believes the bench to be unstable. Ms. Corral[] stated that the seat of the bench is not attached to the concrete legs of the bench and that upon coming into the pool area, she observed the seat of the bench lying on its side.
>
> . . . .

She admitted that it was possible that she had told the interviewer that the bench was unstable and hazardous. But she also indicated that it was possible that she might have come up with the idea that the bench was unstable because of the severity of Esquivel's injury.

Corral described the pool area as gated, with holly bushes around the inside of the fence that did not obstruct the view from the outside. She stated that at some point between 2003 and 2005, Avery Pointe acquired the concrete outdoor furniture—it put up the fence and added locks to the pool gate at the same time. She was not present when the benches were delivered or installed. Corral stated that prior to July 2005, she had sat on the concrete benches, found them very sturdy, and had never experienced the top of the bench slipping. She had never seen the bench topple over from someone sitting on it, and she testified that she "had no clue there was tape" installed on the bottom of the concrete bench.

### 4. Edward Esquivel's Affidavit and Photos

Esquivel's father stated in his affidavit that Esquivel's injury occurred "as the result of the seat 'slab portion' of a concrete bench falling and entrapping his right hand." He stated,

---

Ms. Corral[] stated that she believes the bench could be a hazard, since the seat is not attached to the legs. However, she does not believe this incident would have occurred, had the boys not been running around the pool area. Ms. Corral[] stated that it would take a lot of force to knock off the seat of the bench and had the claimant not been running and falling, then the seat would not have come off.

9

On August 1, 2008 I went to the swimming pool area of the premises known as Avery Pointe at Cityview for the purpose of taking photographs of the concrete bench which caused the injury to my son[.] . . . The pictures marked Exhibits "D" and "E" are the pictures that I took on that day.

Exhibit "D" shows part of the top portion of the bench slightly removed from one of its pedestals. Exhibit "E" shows the top portion of the bench completely removed from its pedestals and leaning against them.

## D. Analysis

The supreme court affirmed a no-evidence summary judgment on the actual or constructive knowledge ground in a recent, remarkably similar premises liability case. *Gillenwater*, 285 S.W.3d at 880, 883–84. While lowering himself into a pool-side chair near a condominium swimming pool, Gillenwater lost the tip of his right finger to a broken weld on the chair's frame. *Id.* at 880. He offered photographs of the chair taken by an insurance adjuster after the injury and the deposition of Frank Collins, the condominium manager, as evidence to support an inference that the chair was already broken and that the broken welds were easily visible to the naked eye prior to the accident. *Id.* at 883. Collins's testimony included that it was the condominium's responsibility to maintain the outdoor equipment in a safe condition, that he first became aware of the injury the day after the incident, that he had an associate's degree in welding, that he knew the combination of chlorine and salt water in the air had a corrosive effect on metal chairs by the pool, and that he had an employee inspect, wash, and clean all outdoor lounge chairs by the pool

10

(including the chair at issue) six days a week. *Id.* Gillenwater and Collins inspected the chair the day after the injury, and the broken weld was visible to both men and was on the same side of the chair where Gillenwater had placed his hand; Collins inspected the other chairs by the pool, found "hairline cracks" in those chairs, and repaired or replaced them. *Id.*

The supreme court held that the evidence only established "that Collins first became aware of the injury and the chair's condition *the day after the injury occurred. . . .* The fact that Gillenwater's fingertip was severed and that the chair broke is evidence that a dangerous condition existed, *but it offers no evidence as to how long it existed*." *Id.* at 883–84 (emphasis added).

Esquivel argues that he produced more than a scintilla of probative evidence that JPM had actual or constructive knowledge of the dangerous condition of the concrete bench. He states:

> As discussed above, the summary judgment evidence (produced by both parties): Esquivel's deposition testimony, the affidavit of Edward Esquivel and the photographs showing the presence of the adhesive tape between the top of the column of the bench and the underside of the concrete seat slab. Additionally, Corral's deposition testimony confirms that the top of the bench was heavy and that, following Esquivel's injury, she saw the pillar knocked over and the top portion of the bench on the ground. The sheer weight of the concrete bench (between 200–300 lbs) and [the] existence of the adhesive tape support that JPM either caused the harmful condition of the bench by using the adhesive tape to try to secure the concrete bench, that JPM knew of the harmful condition of the concrete bench and negligently failed to remove it[,] or prove[s] the harmful condition was present for so long that it should have been discovered or removed in the exercise of reasonable care.

11

We disagree.  Like in *Gillenwater*, nothing in the record here shows that JPM created, knew about, or could have discovered the dangerous condition before the incident occurred on July 31, 2005.  JPM bought the bench from Tex-Art at some point after Corral moved to Avery Pointe in 2003 and before July 2005, and Tex-Art installed it with at least two other benches that are represented in the photographs.[7] Shatley, the bench's manufacturer, testified that he was not aware of any defects in the benches that Tex-Art sold to Avery Pointe and that the benches were properly set up when delivered.  He personally inspected them three years later, on August 13, 2008, and found them to be properly set up.  His affidavit did not address whether an adhesive is used in the benches' manufacture or assembly.  Corral testified that prior to the July 31, 2005 incident, she sat on the benches, found them to be sturdy, had never seen anyone else sit on the bench and have it topple over, and "had no clue there was tape" on the bottom of the concrete bench.

Esquivel testified that all of the benches looked the same and that he had no way of knowing that this particular bench was going to collapse.  Although he referred to "[a] type of adhesive used on the pedestal to secure the bench" as an

_____

[7] Contrary to Esquivel's assertion that adhesive tape can be seen in Exhibits "D" and "E," the poor reproduction quality of the photographs in the record does not reveal this feature.  Nonetheless, assuming that there is adhesive tape on the bench, or that there is some sort of adhesive as referenced in Esquivel's deposition, it does not follow from its mere presence either that JPM knew about it prior to July 31, 2005, or that JPM—as opposed to Tex-Art or an Avery Pointe tenant—placed it there.  Less than a scintilla of evidence exists when the evidence is so weak that it does nothing more than create a mere surmise or suspicion of a fact.  *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

actual defect in the bench and said that his father told him "that there was some kind of adhesive on the bottom of the bench to keep it in place," he did not know if the other benches also used adhesive. Further, he testified that he did not know whether the bench had ever fallen before, whether anyone else had ever been injured because of the bench, or whether the apartment complex knew about "the allegedly dangerous condition" before his injury.

The interview notes, which reflect that Corral told the interviewer that she thought the bench was unstable; that its seat was not attached to its legs; that when she went into the pool area, she saw the seat lying on its side; and that it could be a hazard since the seat was not attached to the legs, are from an interview given by Corral *after* the July 31, 2005 incident. Nothing in the interviewer's notes references any sort of adhesive or adhesive tape on the bench at that time. Edward's affidavit reflects that he went to the apartment complex on August 1, 2008, three years after the incident, and took photographs—he does not mention anything about an adhesive or adhesive tape in his affidavit.

On the record here, there is no evidence that JPM knew or could have discovered before the July 31, 2005 incident that the bench was defective or that JPM, as opposed to the manufacturer and installer, Tex-Art, or an Avery Pointe tenant, knew about the alleged adhesive or adhesive tape or placed it there to keep the bench seat attached to its legs. *See Gillenwater*, 285 S.W.3d at 883–84; *see also Parks v. State & Ale of Tex., Inc.*, No. 01-04-00080-CV, 2006 WL 66428, at *3

13

(Tex. App.—Houston [1st Dist.] Jan. 12, 2006, pet. denied) (mem. op.) (stating, in suit to recover for injuries sustained by restaurant patron when his chair broke, that patron failed to direct the court to anything that would create a material fact issue regarding whether the manager or anyone else at Steak & Ale knew or should have known that the chair created an unreasonable risk of harm). Therefore, we overrule Esquivel's first issue. And because we conclude that the trial court did not err by granting JPM's no-evidence motion for summary judgment, we do not reach Esquivel's second issue on comparative negligence as a fact issue precluding summary judgment. *See* Tex. R. App. P. 47.1.

## IV. Conclusion

Having overruled Esquivel's dispositive issue, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL: LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED: July 1, 2010