02-10-267-CV











 




 
 
 
 
 
  
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND
 DISTRICT OF TEXAS
 FORT
 WORTH
 
 




 

 

NO. 02-10-00267-CV 

 

 




 
 
 Judith MacDonald, Individually and as
 Representative of the Estate of Walter MacDonald, Stephanie Lynn MacDonald,
 Thomas Wayne MacDonald, Trevor MacDonald, AND Wayne J. MacDonald
 
 
  
 
 
 APPELLANTS
 
 
 
 
  
 V.
  
 
 
 
 
 Harris Methodist HEB Hospital
 
 
  
 
 
 APPELLEE 
 
 




 

 

----------

 

FROM THE 153rd
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

         
This is an appeal from summary judgment orders in favor of appellee
Harris Methodist HEB Hospital in a health care liability suit.  Appellants,
the family of Walter MacDonald, bring two issues in which they contend they
provided sufficient evidence of causation to defeat appellee’s summary judgment
motions.  We reverse and remand.

Background

         
Walter MacDonald was diagnosed at the hospital with an aortic dissection. 
Initially, the care for his particular type of dissection involved only medical
management in a hospital setting rather than surgery.  Over the course of
his hospital stay, however, his small bowel became ischemic and eventually infarcted, or died.  By the time doctors attempted to
operate on MacDonald on Tuesday afternoon, September 26, 2006, they could not
repair the bowel, and he died.  Appellants sued appellee
claiming that the nursing staff failed to timely report significantly changed
lab values to MacDonald’s doctor, David Carter.  After appellee
filed a traditional motion for summary judgment on appellants’ claims,
appellants added an additional negligence claim and designated an additional
expert, contending that the nurses had also failed to report a highly elevated
respiratory rate that indicated MacDonald had become acidotic,
a side effect of the ischemia in the small
bowel.  Appellee then filed a motion for
no-evidence summary judgment on the additional negligence claim.  The
trial court granted the traditional summary judgment as to the allegation that
the nurses failed to timely report the lab values to Dr. Carter; however, the
trial court stated that it was not ruling on the newly added claim about the failure
to report the elevated respiratory rate.[2] 
Appellee then filed a second motion for no-evidence
summary judgment on the second claim, almost identical to the first motion; the
trial court granted that motion.  Appellants appeal the trial court’s
rulings on both summary judgment motions.

Standards
of Review

We
review a traditional summary judgment de novo.  Travelers
Ins. Co. v. Joachim, 315 S.W.3d 860, 862 (Tex. 2010).  We
consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding
evidence contrary to the nonmovant unless reasonable
jurors could not.  Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848
(Tex. 2009).  We indulge every reasonable inference and resolve any
doubts in the nonmovant’s favor.  20801, Inc. v. Parker, 249 S.W.3d 392, 399 (Tex. 2008). 
A defendant who conclusively negates at least one essential element of a cause
of action is entitled to summary judgment on that claim.  Frost Nat’l
Bank v. Fernandez, 315 S.W.3d 494, 508 (Tex. 2010); see Tex. R. Civ.
P. 166a(b), (c).

After
an adequate time for discovery, the party without the burden of proof may,
without presenting evidence, move for summary judgment on the ground that there
is no evidence to support an essential element of the nonmovant’s
claim or defense.  Tex. R. Civ. P. 166a(i).  The motion must specifically state the elements
for which there is no evidence.  Id.; Timpte Indus., Inc. v. Gish, 286 S.W.3d 306,
310 (Tex. 2009).  The trial court must grant the motion unless the nonmovant produces summary judgment evidence that raises a
genuine issue of material fact.  See Tex. R. Civ. P. 166a(i) & cmt.;
Hamilton v. Wilson, 249 S.W.3d 425, 426 (Tex. 2008).

When
reviewing a no-evidence summary judgment, we examine the entire record in the
light most favorable to the nonmovant, indulging
every reasonable inference and resolving any doubts against the motion.  Sudan v. Sudan, 199 S.W.3d 291, 292 (Tex. 2006). 
We review a no-evidence summary judgment for evidence that would enable
reasonable and fair-minded jurors to differ in their conclusions.  Hamilton,
249 S.W.3d at 426 (citing City of Keller v. Wilson, 168 S.W.3d 802, 822
(Tex. 2005)).  We credit evidence favorable to the nonmovant
if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not.  Timpte Indus., 286 S.W.3d at 310 (quoting Mack
Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex.
2006)).  If the nonmovant brings forward more
than a scintilla of probative evidence that raises a genuine issue of material
fact, then a no-evidence summary judgment is not proper.  Smith v.
O’Donnell, 288 S.W.3d 417, 424 (Tex. 2009); King Ranch, Inc. v. Chapman,
118 S.W.3d 742, 751 (Tex. 2003), cert. denied, 541 U.S. 1030 (2004).

Notice
of Appeal Sufficient to Review Both Summary Judgments

In a
letter brief, appellee contends that appellants’
traditional summary judgment is not a proper subject of the appeal because the
notice of appeal references only the July 6, 2010 no-evidence summary judgment
and “ancillary rulings,” and the prior, traditional summary judgment is not an
ancillary ruling.[3] 
Thus, according to appellee, rule 25.1 deprives this
court of jurisdiction to consider the traditional summary judgment in this
appeal.  Tex. R. App. P. 25.1.

         
The July 6, 2010 order granting the no-evidence summary judgment is the final
order disposing of any remaining pending claims and parties in the case; thus,
neither of the summary judgments was appealable until that order was
signed.  See Lehmann v. Har-Con Corp., 39 S.W.3d 191, 192 (Tex. 2001).  The filing of a notice
of appeal invokes the appellate court’s jurisdiction over all parties to the
trial court’s judgment or order appealed from.  Tex. R.
App. P. 25.1(b).  Nothing in rule 25.1 limits the issues that a
party may raise on appeal after having properly invoked our jurisdiction. 
See Anderson v. Long, 118 S.W.3d 806, 809 (Tex. App.––Fort Worth 2003,
no pet.); see also Webb v. Jorns, 488 S.W.2d
407, 408–09 (Tex. 1972) (holding that unsevered,
partial summary judgment order was merged into trial court’s final
judgment).  Rather, the limitation of appellate issues is governed by
other appellate rules that are not applicable here.  See,
e.g., Tex. R. App. P. 33.1, 34.6(c); Anderson, 118 S.W.3d at 809–10. 
The requirement in rule 25.1(d) that the notice of appeal must state the date
of the judgment or order appealed from does not limit what trial court rulings
may be challenged on appeal.  Tex. R. App. P. 25.1(d); Anderson,
118 S.W.3d at 810; see Valls v. Johansen &
Fairless, L.L.P., 314 S.W.3d 624, 631 n.7 (Tex. App.––Houston [14th Dist.]
2010, no pet.) (“A notice of appeal need not identify every adverse
interlocutory ruling the appellant intends to challenge; instead, the notice
must state only the date of the judgment or order from which he appeals––in
this case, the order granting summary judgment.”).  Instead, the date of
the judgment appealed from is used to determine whether the appeal is
timely.  Anderson, 118 S.W.3d at 810; see Tex. R. App. P.
26.1; John Hill Cayce, Jr., et al., Civil Appeals in Texas:  Practicing
Under the New Rules of Appellate Procedure, 49 Baylor L. Rev. 867, 886
(1997).  Accordingly, we reject appellee’s contention that rule 25.1
limits our jurisdiction to review any summary judgment granted before the July
6, 2010 no-evidence summary judgment.

Traditional
Motion for Summary Judgment

         
In their first issue, appellants claim that they raised a fact issue sufficient
to defeat appellee’s traditional motion for summary judgment.

         
The thrust of appellee’s traditional motion for summary judgment is that
appellants cannot prove that the nurses’ failure to report MacDonald’s
out-of-range lab results to his surgeon, Dr. Carter, was a proximate cause of
his death.  According to appellee, Dr. Meltzer,
the nephrologist whom Dr. Carter consulted regarding
MacDonald’s condition, testified in his deposition about the lab values, “There
really isn’t much on there that I think would catch a nurse’s eye and that they
would . . . say ‘I better call Dr. Meltzer about this one.’  . . . . 
I don’t think there’s much here that I would expect to catch a nurse’s
eye.”  Appellee contends that this testimony
shows that neither Dr. Carter nor Dr. Meltzer would have placed any significant
value on these lab results and thus the evidence does not support a breach of
duty or proximate causation.

Applicable
Facts

         
Appellants’ expert, Dr. Wayne Flye, a vascular
surgeon, agreed in his deposition testimony that his expert report was “against
Dr. Carter primarily.”[4] 
Dr. Flye agreed that his criticism of the nursing
staff was that they did not report significantly increased BUN and creatinine[5]
lab values to Dr. Carter timely and that had they done so, Dr. Carter would
have taken MacDonald to surgery earlier, thus saving his life.  Dr. Flye opined that MacDonald’s bowel probably became totally
occluded and therefore necrotic “over the course of the night of the 25th,”
i.e., Monday night to early Tuesday morning.  As far as MacDonald’s
survival chances, Dr. Flye testified as follows:

Q.  . . . 
What would you say survival is if we have to operate on and repair in Mr.
MacDonald the renal artery and the SMA [superior mesenteric artery] at the same
time?

 

A.  Well, it
depends upon at what point you operated, because if you have a bowel that’s
patchy necrosis many times you can get these patients through that because
you’ve got bowel that was left behind or eliminating from the effected source segmentally.  So I can’t tell you since he was
operated on in the afternoon of Tuesday I can’t tell you what would have been
done at 7:00 or 7:30 that morning.  It may have been patchy distribution.

 

. . . .

 

Q.  If he would have
been operated on for renal artery and the SMA on Monday morning, what would his
survival have been?

 

A.  Probably
more likely than not surviving, but I probably would not have told the family
95 percent survival, probably somewhere in the 50 plus to 80 plus range, and
the problem with these individual cases is they’re so different one from
another that if you take 100 cases like this you’ll get a number but the range
is such that it might be quite variable.

 

Q.  Each
dissection is different?

 

A.  Yes.

 

He
further testified,

Q.  . . . 
To make sure I understand your opinion about Tuesday’s labs, the elevation of the creatinine and BUN above
what they were earlier in the hospitalization are due this time to infarcted bowel?

 

A.  Well, rather
it’s a rather dramatic increase in 24 hours, yeah.

 

Q.  Right. 
And that’s due to infarcted bowel?

 

A.  Well, the
two are close together.  I can’t tell you whether it’s dissection of the
renal arteries as well as the SMA, but certainly the events that are precipitating
that are what caused occlusion of the blood flow to the bowel.

 

         
Dr. Flye testified that even though MacDonald’s creatinine and BUN were rising at a slow pace over the
course of his treatment, the change the nurses failed to report the day before
his death was dramatic.  The two symptoms of bowel ischemia exhibited by
MacDonald were diarrhea and extreme pain requiring morphine.  Dr. Flye opined,

Q.  . . . Now,
what is it about the increased creatinine and BUN levels that indicates an ischemic bowel?

 

A.  The increase
and rise of creatinine in that 24 hour period in view
of the CT scan beforehand indicating some compromise and the fact that now the
patient is deteriorating.  So with the increase in renal dysfunction Dr.
Carter is onsite and feels that the patient needs to be explored.

 

. . . .

 

A.  So it’s his
clinical impression in view of the increasing rate of deterioration of renal
function in arteries that are in proximity to the arteries that would [a]ffect the bowel function.

 

Dr. Flye also testified that he concluded that the BUN and creatinine results were available to the nurses at 5:15
a.m. but that the records do not show that anyone communicated these results to
Dr. Carter until 9:25 a.m. when he made his rounds for the morning; by that
time, it was too late for Dr. Carter to arrange for a surgeon because all of
the surgeons had started their first surgeries around 7:30 a.m. that
morning.  Dr. Flye believed that if the nursing
staff had notified Dr. Carter before the first round of surgeries had started
for the day, MacDonald would have made it into surgery earlier and survived.

         
According to Dr. Flye, the bowel infarction probably
would not cause the sharply increased creatinine and
BUN levels, but these results showed impaired kidney function that would result
in an infarcted bowel.  The results are
significant because, according to Dr. Flye,

Well, it’s a response
of Dr. Carter.  I mean as demonstrated by his immediate response in
getting him to surgery, trying to get a general surgeon.  In his
deposition those numbers were big red flags for him.  He didn’t write a
note and say this is what they are, I’ll think about them again tomorrow. 
I mean he responded . . . .”

 

         
Appellee’s motion also contended that a Dr. Hull or Hall had indicated in the
progress notes, attached to their motion, that he had the creatinine
and BUN values at 7:58 a.m. and that he made orders that the nurses followed.[6]  Appellee
claims this shows that there is a lack of proximate cause and breach of duty
because the nurses reported the values to someone.  But Dr. Flye testified that he would not expect Dr. Hull to pass
along that information because he was focused at that time only on whether
MacDonald was a good candidate for dialysis.  According to Dr. Flye, the nurses nevertheless still needed to communicate
the lab values to Dr. Carter because “[t]he nurses are directly responsible to
the attending physician, Dr. Carter, not to Dr. Hull.”

         
Appellants’ response indicates that the summary judgment was improper because
there is evidence that Dr. Carter would have considered the elevated creatinine level significant and immediately arranged for
“a corrective surgical procedure that, in all reasonable medical probability,
would have saved Mr. MacDonald’s life.”

         
Dr. David Carter, a cardiothoracic surgeon, testified in his deposition that he
was concerned about MacDonald’s renal output because of how much medicine and
dye they had been giving him.  He had MacDonald’s renal output checked and
talked to Dr. Meltzer every day.  According to Dr. Carter, ischemia in
particular was something he looked for every day.[7]  However, he could not remember
finding out that the nurses had failed to report something to him that he would
have considered significant.  Dr. Carter thought they were “winning the
battle” on the 25th because although MacDonald’s creatinine
levels had been going up, his urine output was good; however, on the morning of
the 26th, Dr. Carter was for the first time, “absolutely, positively sure
[they] had lost the battle.”  He was not sure about MacDonald’s condition
on the night of the 25th and early morning of the 26th, but when he walked in
on the 26th, looked at MacDonald, and the nurses gave him their report, “that
was the first time [he] was sure.”  Dr. Carter did not even order another
study at that time; he ordered the operating room to get ready.  Dr.
Carter could not opine as to when there was at least a fifty-one percent chance
of saving MacDonald.

Dr.
Carter explained that surgery is not always indicated when a dissection
involves the kidneys or gut because they could recover instead of becoming
ischemic.  He decided to treat MacDonald conservatively because it
appeared that the kidneys had some damage due to emboli rather than lack of
blood flow, but he explained that Dr. Meltzer felt that the creatinine
level “was going up but . . . at a
pace that didn’t indicate renal death.”  Dr. Meltzer initially thought the
kidneys would recover.  When Dr. Carter was asked whether the kidney
function impacted how he viewed the potential for small bowel ischemia, Dr.
Carter said, “We’re going to base some of that on how we feel about the kidneys
in the sense of is the kidney disease progressive, do we think it’s getting
worse, do we think it’s going south.  That’s going to impact how we think
about the big picture, yes.”  When asked if he had an opinion as to
whether the kidneys were completely infarcted by
Tuesday, Dr. Carter answered, “Based on the rapid increase in BUN and creatinine in six hours, I would say, yes.”  Dr.
Carter speculated that the bowel died before the kidneys, but he said it was
just his interpretation of what had happened.

         
Appellants attached to their response Dr. Carter’s answers to interrogatories
in which he stated that he did not dispute the times listed in the nursing
records, i.e., that he saw MacDonald for the first time at 9:25 a.m. on the
26th, and he does not recall that anyone called him about the lab values, nor
does the chart reflect that anyone did.  He also answered that sometime
between 9:30 and 10:30 a.m. on the 26th, he and the other physicians felt like
MacDonald had suffered from necrotic bowel and nothing could be done to save
him.

Analysis

         
Appellee contends that it conclusively proved a lack
of causation because appellants cannot prove that MacDonald’s chance of
survival was greater than fifty percent.  However, appellee
did not move for summary judgment on this ground; thus, it would not have been
proper for the trial court to grant summary judgment on this ground.  See
State Farm Lloyds v. Page, 315 S.W.3d 525, 532 (Tex. 2010); Timpte Indus., 286 S.W.3d at 310.

         
Appellee additionally contends that the summary
judgment was proper because appellants cannot show that Dr. Carter would have
altered his treatment of MacDonald based on the lab results in that MacDonald
showed other evidence of ischemia that Dr. Carter chose not to act on.  It
further contends that Dr. Meltzer’s testimony that he would not have expected
the results to catch the nurses’ eyes conclusively proves the lack of a
deviation from the standard of care.  Appellee
relies heavily on the fact that Dr. Carter did not say he would have ordered
MacDonald immediately into surgery had he received the BUN and creatinine values earlier on the morning of September 26th
to show that it conclusively proved a lack of causation.[8]

         
Dr. Carter’s deposition testimony shows that the kidneys were probably infarcted by Tuesday morning based on the marked increased
in the BUN and creatinine levels.  Although appellee contends that there is no evidence those increased
levels would have been significant to Dr. Carter at 5:15 a.m.[9] as opposed to
9:25 a.m., Dr. Carter testified that he “ordered the operating room to get
ready” as soon as he saw MacDonald at 9:25 a.m. and got the nurses’
report.  What Dr. Carter actually did upon receiving those results is at
least some probative evidence of what he would have done if he had received
those results earlier, especially in light of the fact that appellee
did not present any evidence of an intervening, significant change in
MacDonald’s condition between the time the results were reported to the nurses
and the time the nurses reported the results to Dr. Carter.  Moreover, the
fact that a Dr. Hull or Hall may have made orders based on the BUN and creatinine results in the early morning of the 26th, or
that Dr. Meltzer did not think the nurses would have found those levels
significant, does not change what Dr. Carter, MacDonald’s primary physician,
actually did when he finally received those values, nor does it change Dr. Flye’s opinion testimony that the nurses should have
appreciated the significance of the change in those values and reported them
immediately to Dr. Carter.

         
We conclude that the evidence does raise a fact issue sufficient to defeat a
traditional motion for summary judgment; thus, we conclude and hold that the
trial court erred by granting appellee’s traditional motion for summary
judgment on appellants’ claims that the nurses’ negligent failure to timely
report MacDonald’s BUN and creatinine levels to Dr.
Carter was a proximate cause of MacDonald’s death.[10]  We sustain appellants’ first
issue.

No-Evidence
Motion for Summary Judgment

         
Appellee contended in its no-evidence motion for
summary judgment that appellants did not present any expert evidence of
proximate cause on their new claim that the nurses failed to timely notify Dr.
Carter that MacDonald was experiencing tachypnea on
the night of the 25th and early morning of the 26th.  In their response to
appellee’s motion, appellants attached Dr. Flye’s
deposition and a new affidavit from Dr. Flye.  Appellee objected to the affidavit, claiming it was
speculative and conclusory; however, the trial court
denied appellee’s objections to the affidavit.

         
The affidavit states that tachypnea and evidence of
metabolic acidosis are symptoms of end-organ ischemia.  According
to Dr. Flye’s affidavit, MacDonald “began to exhibit
evidence of sustained tachypnea” on the evening of
Monday, September 25, 2006.  Dr. Flye
averred that

[a]pparently, the nurses did not contact Dr. Carter or any
other physician about this new finding.  Had Dr. Carter been provided this
information on Monday evening, it is more likely than not that he would have
further investigated the problem and discovered the need for immediate surgical
correction of the dissection along with revascularization of the small
bowel.  Arterial blood gases would have revealed metabolic acidosis. 
Dr. Carter would likely have arranged for emergent abdominal exploration just
as he eventually did in reality on the following day. . . .

 

         
. . . Had Dr. Carter known of the patient’s metabolic acidosis in time on
Tuesday morning, he could have arranged for Mr. MacDonald to undergo an
exploration in the 7:30 a.m. surgical schedule at this particular hospital on
September 26, 2006.  Had this occurred, I believe it is more likely than
not that Mr. MacDonald’s aorta could have been sufficiently repaired so as to
re-establish blood flow through the superior mesenteric artery.  This
would have saved the small bowel. . . .

 

Applicable
Law

         
The relevant standard for an expert’s affidavit opposing a motion for summary judgment
is whether it presents some probative evidence of the facts at issue.  Ryland Group, Inc. v. Hood, 924 S.W.2d 120, 122 (Tex. 1996). 
Conclusory affidavits are not enough to raise fact
issues because they are not credible, nor are they susceptible to being readily
controverted.  Id.; see Tex. R.
Civ. P. 166a(c).  To be reliable, expert testimony must be grounded in the
methods and procedures of science and be more than subjective belief or
unsupported speculation.  Kerr-McGee Corp. v. Helton,
133 S.W.3d 245, 254 (Tex. 2004); Gammill v.
Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 726, (Tex. 1998).

Analysis

         
Dr. Flye’s affidavit testimony is similar to the
affidavit and deposition testimony in Benitz
v. Gould Group, 27 S.W.3d 109, 114–16 (Tex. App.––San Antonio 2000, no
pet.), and Bottoms v. Smith, 923 S.W.2d 247, 251–52 (Tex. App.––Houston
[14th Dist.] 1996, no writ).  In both of those cases, qualified experts
offered testimony that if certain tests had been performed, those tests would
have revealed significant information that doctors would have acted on and that
would have increased the decedents’ chances of survival.  Benitz, 27 S.W.3d at 114–16;
Bottoms, 923 S.W.2d at 251–52.  Such evidence was not conclusory nor did it constitute impermissible inference
stacking; it represented a “series of probabilities” based on the experts’
medical experience that raised fact issues sufficient to defeat summary
judgment motions.  Benitz, 27 S.W.3d at 115.

         
Here, Dr. Flye is a vascular surgeon with experience
in treating aortic dissections.  He averred in his affidavit––based on his
personal experience and the experience of colleagues, and his review of the
medical records and depositions in this case––that (1) MacDonald began
exhibiting tachypnea on Monday evening, September 25,
2006, (2) tachypnea is a symptom of end-organ
ischemia, (3) the nurses failed to report this symptom to Dr. Carter on Monday
evening when it began, (4) had Dr. Carter been so informed he would have
ordered a test to confirm acidosis, (5) acidosis would have been revealed in
such a test because MacDonald was, in fact, ischemic and infarcting
at or around that time, and (6) that Dr. Carter would have had time to arrange
for surgery before the 7:30 a.m. rotations began, thus saving MacDonald’s
life.  This testimony is not conclusory, nor is
it so speculative as to result in impermissible inference stacking that it
would prevent appellee from being able to controvert
it at trial.  See Ryland, 924 S.W.2d at 122; Souder v. Cannon,
235 S.W.3d 841, 849 (Tex. App.––Fort Worth 2007, no pet.); Benitz,
27 S.W.3d at 115–16.

This
evidence is likewise sufficient to raise a fact issue on appellants’
allegations about the tachypnea; thus, the trial
court erred by granting appellee’s no-evidence summary judgment as to this
claim.  See Benitz, 27
S.W.3d at 115–16.  We sustain appellants’ second issue.

Conclusion

Having
sustained both of appellants’ issues, we reverse the trial court’s judgment and
remand this case to the trial court.

 

 

 

TERRIE LIVINGSTON

CHIEF JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

 

DELIVERED: July 7, 2011

 

 


















         
[1]See Tex. R. App. P. 47.4.





[2]The
trial court’s letter ruling is somewhat confusing because it initially purports
to grant the no-evidence summary judgment, which challenged only the new
respiratory rate allegation, yet it also states that no ruling was being made
as to the respiratory rate allegation.  The record in its entirety shows
that the trial court meant to grant only two motions:  the traditional
motion challenging the failure-to-report-lab-values claims and the no-evidence
motion challenging the new failure-to-report-elevated-respiratory-rate claims
added in the second amended petition.





[3]We
grant appellee’s “Motion for Leave to Amend Appellee’s Brief Concerning Only
the Proper Claims on Appeal” requesting to raise this argument.





[4]Although
appellee attached excerpts from Dr. Flye’s deposition testimony to its motion, appellants
attached the entire deposition to their response.





[5]Creatinine
is a component of urine.  Stedman’s Med. Dictionary 456 (28th ed.).  “BUN
stands for blood urea nitrogen. Urea nitrogen is what forms when protein breaks
down.”  MedlinePlus Online Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/003474.htm (last visited June 14, 2011).





[6]The
progress notes are included in the appellate record, but they are largely
indecipherable.  Regardless, appellants do not dispute appellee’s
contention that the notes show that a Dr. Hull, or Hall, a cardiologist, knew
about MacDonald’s creatinine and BUN values at
approximately 7:58 a.m. on the 26th, that he gave orders to the nurses, and
that the nurses apparently followed those orders. 





[7]Dr.
Carter explained that ischemia is a lack of blood flow, as opposed to an
infarct, which is lack of blood flow severe enough to cause tissue death.





[8]Appellee also says that Dr. Flye
merely speculated that the hospital’s surgery rotations began around 7:00 or
7:30 a.m. and that if the nurses had let Dr. Carter know earlier, he would have
been able to get a surgeon to operate on MacDonald earlier.  But Dr. Flye testified that the depositions and medical records he
had reviewed showed that when Dr. Carter tried to get a surgeon, Dr. Purgett, to operate, he was already in the middle of
another surgery that had started earlier and could not stop; MacDonald’s
surgery had to wait five hours until Dr. Purgett was
finished.  Dr. Flye also testified that in his
experience hospitals generally begin the first rotation of surgeries around
7:30 a.m.  Although appellee may disagree with
this evidence, it is nonetheless evidence that had the nurses given Dr. Carter
the information earlier, he would have been able to order surgery before Dr. Purgett had begun a different surgery.





[9]Appellee did not present any evidence contradicting Dr. Flye’s testimony that he believed the results came back
from the lab around this time based on other deposition testimony he had read.





[10]There
may be more than one proximate cause of an event.  Del
Lago Partners, Inc. v. Smith, 307 S.W.3d 762, 774
(Tex. 2010).