

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-14-00020-CV

WENDOLYN MESSNER,
AS DEPENDENT ADMINISTRATOR, Appellant

V.

MARK L. BOON AND BOON SHAVER
ECHOLS COLEMAN & GOOLSBY, P.L.L.C., Appellees

On Appeal from the County Court at Law
Rusk County, Texas
Trial Court No. 02-043 A

Before Morriss, C.J., Moseley and Carter,* JJ.
Opinion by Justice Moseley

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

O P I N I O N

Wendolyn Messner, as the administratrix of the estate of Delbert M. Messner, filed suit May 14, 2013, against an attorney, alleging that the attorney had been negligent and had breached his fiduciary duty in the attorney's legal representation of both Delbert (during his lifetime) and the executrix of his estate, Juanita Bengel (Delbert's niece), after Delbert's demise. The trial court granted a traditional motion for summary judgment filed by the attorney and his law firm and entered a take-nothing judgment against Wendolyn.[1] Wendolyn appeals.

We find that Wendolyn, as the administratrix of the estate, had the standing to pursue claims belonging to Delbert's estate and that the trial court erred in granting summary judgment on those claims. However, we also find that Wendolyn did not possess the authority to raise legal malpractice claims on behalf of Bengel for the attorney's representation of Bengel. Thus, we affirm the trial court's judgment with respect to claims against the attorney relating to Bengel, but reverse the trial court's judgment with respect to claims raised on behalf of Delbert's estate and remand those claims for further proceedings consistent with this opinion.

I.      Factual and Procedural Background

A.      The 1996 Trusts

Delbert and his wife, Barbara E. Messner, hired attorney Jennifer Davalos to draft The Delbert M. Messner and Barbara E. Messner Revocable Living Trust Agreement (the Trust Agreement). The Trust Agreement, executed by Delbert and Barbara in 1996, set up the framework for the establishment of three separate trusts designed to accomplish different goals via trusts that would be created upon the death of the first spouse. The first trust, called

---

[1]We use Wendolyn's name in this opinion to refer to her in her capacity as administrator of Delbert's estate.

2

Survivor's Trust A, would be "set up for the Surviving Spouse" and would be revocable during the lifetime of the surviving spouse. The second trust, called Decedent's Trust B, would be irrevocable and was designed to take advantage of the available exclusion amount. The third trust, called the Excess Property Trust C, would give the surviving spouse an interest in the entire net income of the trust for life and up to $5,000.00 per year in principal.

With respect to Trust A and Trust C, the Trust Agreement stated that Delbert had "a general power of appointment as is necessary to bring the Trust into compliance with the provisions of Section 2056(b)(5) of the Internal Revenue Code," so that it would qualify for the marital deduction.[2] The Trust Agreement provided that (1) upon the death of the surviving spouse, all remaining trust assets would be held in trust for the benefit of Barbara and Delbert's only son, Michael T. Messner, and that (2) upon Michael's death, all remaining assets would "go to LE TOURNEAU UNIVERSITY to establish the Dell and Barbara Messner Scholarship

---

[2] Section 2056(b)(5) of the Internal Revenue Code states the following:

> **5.     Life estate with power of appointment in surviving spouse.**—In the case of an interest in property passing from the decedent, if his surviving spouse is entitled for life to all the income from the entire interest, or all the income from a specific portion thereof, payable annually or at more frequent intervals, with power in the surviving spouse to appoint the entire interest, or such specific portion (exercisable in favor of such surviving spouse, or of the estate of such surviving spouse, or in favor of either, whether or not in each case the power is exercisable in favor of others), and with no power in any other person to appoint any part of the interest, or such specific portion, to any person other than the surviving spouse --
>
>> (A)     the interest or such portion thereof so passing shall, for purposes of subsection (a), be considered as passing to the surviving spouse, and
>>
>> (B)     no part of the interest so passing shall, for purposes of paragraph (1)(A), be considered as passing to any person other than the surviving spouse.
>
> This paragraph shall apply only if such power in the surviving spouse to appoint the entire interest, or such specific portion thereof, whether exercisable by will or during life, is exercisable by such spouse alone and in all events.

I.R.C. § 2056(b)(5) (West, Westlaw current through Sept. 26, 2014).

Endowment." The Trust Agreement also named Jim Hughey, an employee of Le Tourneau University (University), as the successor trustee upon the death of both spouses.

Barbara died in 2000. While "[t]here were assets that had been titled in the name of the revocable living trust[,] . . . there were no assets titled in those specific [A, B, and C] trusts" that were created upon Barbara's death. Thus, in his capacity as the trustee, Delbert hired Neil Joseph, Ronald Stringer, and Ron Stringer & Associates, a CPA firm (collectively referred to as Stringer), to assist him in assigning a value to the estate's assets and in filing Barbara's estate tax returns. Because the exclusion amount in 2000 was $675,000.00, Trust B was to be funded with property valued at that amount. The remaining property was to be divided between Trust A and Trust C, with ten percent of the remaining property being allocated to Trust A and the other ninety percent of the remaining property to be placed into Trust C in accord with the terms of the Trust Agreement. Stringer went to work to value Barbara's property in preparation of her estate tax return.

### B. Boon's Involvement

After Barbara's death, Delbert also hired Mark L. Boon and Boon Shaver Echols Coleman & Goolsby, P.L.L.C. (collectively referred to as Boon), to assist Delbert with probating Barbara's will as a muniment of title and in his capacity as trustee of the living trusts. After Delbert died, Boon represented the personal representative of Delbert's estate. Because Delbert believed that he had supported the University sufficiently throughout his life, he decided not to leave additional sums to the University. Thus, Delbert also hired Boon (1) to help him understand and assess his responsibilities under the Trust Agreement, (2) to prepare a document revoking Trust A, and (3) to prepare a will exercising Delbert's general power of appointment in

4

Trust C in favor of other beneficiaries. Boon prepared a document revoking Trust A. He also drafted a will for Delbert containing the following language:

> All references in my Will to my "Residue" shall mean all the remainder of my property, of whatsoever kind . . . and wheresoever situated . . . not specifically disposed of herein, and also including all property over which I am given a general power of appointment remaining in that certain trust known as the Excess Property Trust "C," said trust established under Article Three, Section 3.04 of The Delbert M. Messner and Barbara E. Messner Revocable Living Trust Agreement dated July 11, 1996 . . . .

Under Delbert's will, (1) forty percent of his residue went to the "Michael Taylor Messner [testamentary] Trust" for Michael's sole benefit during his lifetime, (2) another forty percent of his residue went to the "Michele Suzanne Diaz [testamentary] Trust" for Michael's daughter's sole benefit during her lifetime, and (3) five percent of his residue went to each of the following organizations: the Masonic Lodge #404 in Longview, Texas (Masonic Lodge); the Masonic Home for Aged Masons in Arlington, Texas (Masonic Home); the Masonic Home and School of Texas in Fort Worth, Texas (Masonic School); and the Perritte Memorial Methodist Church in Nacogdoches, Texas (Church). Delbert's will appointed Bengel to be the independent executrix of the will and the trustee of the testamentary trusts created by the will.

In early February 2002, Delbert filed Barbara's estate tax return, which showed (1) that the total value of her estate was $911,675.00, (2) that $675,000.00 was allocated to Trust B, (2) that $20,954.00 was allocated to Trust A, (3) that $188,586.00 was allocated to Trust C, and (4) that $27,135.00 was allocated to expenses. Although Delbert had assigned pecuniary values to the three trusts, Delbert died on February 28, 2002, before he had the opportunity to fund the specific trusts with Barbara's property. According to the terms of the Trust Agreement, Hughey

then became the successor trustee of the non-testamentary trusts and was charged with the responsibility of distributing the trust assets.

Bengel became the executrix of Delbert's estate and the trustee of Delbert's testamentary trusts. She hired Boon to help her execute her duties and hired Stringer to prepare Delbert's estate tax return. Stringer completed an accounting in 2005 to determine what assets belonged to the estate and what assets remained in the trust. Even though Trust A had been terminated and Trust C's power of appointment had been exercised under Delbert's will, the accounting showed that property used to fund Trust A and Trust C had been mistakenly placed into a scholarship trust for the benefit of the University. Nevertheless, Boon wrote on the accounting, "Per [Stringer], this takes into account that Delbert exercised his GPOA over Trust C." In 2005, Bengel wrote a check to the University for $293,241.77 from an account labeled "Estate of D.M. or Barbara Messner." Although Boon was unclear why the check was written, he later testified that the check was for Trust C assets.

### C. The Newly Discovered Mineral Interest and the 2006 Releases

On July 25, 2006, it was discovered that Barbara had additional separate property assets—mineral interests situated in Nacogdoches County, Texas—that had not been previously taken into account. In a letter dated September 21, 2006, on which Bengel was copied, Boon wrote to Hughey to inform him of the mineral interests. The letter stated, "Since the trust of which you are the trustee was the ultimate owner of this property, I am sending it on to you for handling as you deem appropriate."

In late August through November 2006, beneficiaries of Delbert's estate executed releases containing the following language:

6

The undersigned hereby acknowledges that Juanita Bengel, the independent executrix of this estate, has taken care of and managed this estate in compliance with the standards of the Texas Probate Code and the provisions of the Will of Delbert M. Messner and is entitled to an executor's fee under the provisions of the Will . . . but that she has waived her right to be paid said fee.

The undersigned further hereby acknowledges that Juanita Bengel has the right to seek a judicial discharge by filing an action for declaratory judgment under Chapter 37, Texas Civil Practice and Remedies Code, pursuant to the provisions of Section 149D though G of the Texas Probate Code. If Juanita Bengel filed this action, there would be a delay in the undersigned receiving the final distribution from the estate and an increase in the expenses of administration, thereby reducing the value of the assets which the undersigned would receive from the estate.

The undersigned further hereby acknowledges that the undersigned has received any and all accountings which the undersigned deems necessary to determine the sufficiency of the assets . . . .

Accordingly, in consideration for Juanita Bengel not being paid an executor's fee to which she is entitled and in further consideration for Juanita Bengel not filing an action for declaratory judgment to seek a judicial discharge to which she has the right to do, the undersigned RELEASES AND FULLY ACQUITS the estate and all persons acting for or on behalf of the estate including, without limitation, Juanita Bengel, with respect to any and all possible claims, demands, or causes of action, whether known or unknown, that the undersigned may have with respect to the estate or in any way connected with the estate or any of the assets of the estate. This RELEASE shall be binding on the undersigned and the undersigned's heirs . . . . The undersigned has relied solely upon his judgment, belief and knowledge as to the nature and extent of the claims and other matters to which reference is made herein and has not been influenced to any extent whatsoever in signing this document by any representations or statements regarding such matters by Juanita Bengel or any of the agents, attorneys or representatives of Juanita Bengel. This agreement shall inure to the benefit of Juanita Bengel and her heirs and assigns.

Specifically, the releases were signed by the following beneficiaries in exchange for the following amounts: Michael—$90,595.13, Michele—$90,595.13, Masonic Lodge—$23,712.08, Masonic School—$23,712.08, Masonic Home—$23,712.08, Church—$23,712.08. The sums paid in exchange for the release were considered the "full, final and complete satisfaction of that portion of the estate to which the undersigned [beneficiary was] entitled." The dates on the

7

releases establish that Michael and Michele signed their releases after Bengel had been notified about the additional mineral interests. It appeared that Delbert's estate had been settled, but subsequent litigation revealed otherwise.

### D. The LeTourneau Lawsuit and Settlement

On May 16, 2011, the University filed suit against all of the beneficiaries of Delbert's estate, among others, alleging that the University was the fee-simple owner of the mineral interests. Hughey and successor trustee, Ben March, later joined the suit. In response to the lawsuit (the LeTourneau lawsuit), some of the beneficiaries and successors in interest of Delbert's estate countersued, arguing that Hughey never distributed the assets in Trust A and Trust C to Delbert's beneficiaries and that he had instead used all of the assets to fund the Delbert and Barbara Messner Scholarship Trust, thereby giving his employer, the University, a remainder interest in all of the assets of the trust. Thus, some of the LeTourneau Defendants[3] sought (1) a declaratory judgment (a) that assets worth ten percent of Barbara's estate in excess of $675,000.00, including the mineral interests, be finally assigned to Trust A, (b) that ninety percent of Barbara's estate in excess of $675,000.00, including the mineral interests, be assigned to Trust C, and (c) that Trust A and Trust C be assigned to the beneficiaries of Delbert's will, subject to any conveyances they made to third parties, and (2) attorney fees.

Because the Masonic Lodge did not appear, a default judgment was granted against it. During the LeTourneau lawsuit, there was some concern over whether Delbert actually had a general power of appointment over Trust C assets. After the an expert report produced in the LeTourneau lawsuit concluded that Delbert had the general power of appointment and that it was

_____

[3]The term LeTourneau Defendants excludes the Masonic Lodge, which never answered the lawsuit, and includes third parties who were not named in Delbert's will, but who were named as defendants in the LeTourneau lawsuit.

validly exercised, all remaining claims arising out of the LeTourneau lawsuit were settled, including the counterclaims for declaratory judgment. The LeTourneau Settlement Agreement and Release (the Settlement) was entered into between the University, Hughey, March, and Dale Lunsford (another successor trustee), and the LeTourneau Defendants. Under the Settlement, Michael and Michele (and those claiming under them) received $100,000.00; the Church received $45,000.00; and the Masonic Home and the Masonic School each received $30,000.00; each of these payments being made in addition to annual payments that would be made to each. Pursuant to the Settlement, all of the beneficiaries of Delbert's estate, save the Masonic Lodge, agreed to:

> "ACQUIT, CANCEL, RELINQUISH, AND FOREVER DISCHARGE every other party to this agreement, together with their agents, representatives[,] . . . attorneys[,] . . . and assigns from any and all claims, rights, demands, debts, liabilities, controversies, or causes of action, known or unknown, asserted or which could have been asserted . . . arising out of or related to the disputes and controversies described in this [Settlement] at or before the effective date of this [Settlement] . . . . This release includes, but is not limited to, any claims or causes of action arising from or relating to the administration of the Barbara Messner estate, the Delbert Messner estate, the 1996 Messner Revocable Living Trust . . . and any related or resulting trusts, including but not limited to claims for breach of trust, breach of fiduciary duty, negligence, [and] breach of contract . . . . This release is intended to be general in nature and expressly binds the parties, their heirs, assigns, representatives, agents, attorneys and any other person who is authorized, empowered or under any duty to pursue a claim by, through, under or on behalf of the parties, including but not limited to administrators and administratrixes of the estates of Barbara Messner and Delbert Messner and future, current and former successor executors and executrixes of the estates of Barbara Messner and Delbert Messner, trustees and successor trustees[,] . . . any other fiduciary, trustee, agent, receiver, representative, executor or administrator acting for or on behalf of any of the parties.

9

All parties to the Settlement agreed to pay their own attorney fees and costs. The Settlement also stated, "Nothing in [the Settlement] shall be construed to prejudice any claims or defenses of the Parties against any persons or entities that are not parties to this Agreement."

The trial court entered an agreed final judgment in accordance with the Settlement. Specifically, the judgment declared (1) that the mineral interests were Barbara's separate property, (2) that on her death, the minerals passed to and became a part of Trust C, (3) that Delbert had general power of appointment over Trust C assets, (4) that Delbert legally exercised the general power of appointment over the mineral interests because they were Trust C assets, and (5) that the minerals interests passed to the beneficiaries of Delbert's residuary estate under his probated will.

### E. The Lawsuit Against Boon

Again, it seemed that all matters related to the trusts established under the Trust Agreement and Delbert's estate had been settled. However, after Bengel's death in 2009, no one had been appointed to represent Delbert's estate, and Wendolyn, who became the successor personal representative of Delbert's estate after the LeTourneau lawsuit was concluded, believed that the estate had not been represented in the LeTourneau lawsuit. Consequently, Wendolyn determined that the estate could now bring claims similar to the counterclaims filed by the LeTourneau Defendants so long as those claims were not brought against parties to the Settlement. She hired the same attorney that filed the counterclaims in the LeTourneau lawsuit and filed a separate lawsuit, as administrator of Delbert's estate, against Stringer and Boon for negligence and breach of fiduciary duty. The petition recited much of the case history discussed above and made the following claims:

10

Although the Trust Agreement contemplated Trust C was to be treated as a 2056(b)(5) trust for purposes of obtaining a marital deduction, Defendants Stringer and Boon elected to treat Trust C as a 2056(b)(7)[4] trust because they were more familiar with such trusts. This unnecessary or improper election later added to concerns that the Decedent might not have a general power of appointment over Trust C.

. . . .

. . . . Boon prepared a document whereby [Delbert] revoked Trust A . . . [and a] last will and testament for [Delbert] in which he exercised his general power of appointment over Trust C for the beneficiaries of his estate. . . . Therefore, all of the property of the estate of his deceased wife that was to fund Trust A and Trust C should have gone to the beneficiaries of the estate of [Delbert].

. . . . In 2005, Defendant Stringer . . . prepared an accounting showing properties formerly belonging to [Barbara] that were to fund a scholarship trust for the ultimate benefit of LeTourneau University. . . . None of her property went to the Estate of [Delbert]. Because Defendant Boon was an attorney . . . and Defendant[] Stringer . . . [was a] certified public accountant[], Mrs. Bengel relied on and trusted [their] work in helping her marshal the assets of the estate of [Delbert]. But Defendant Boon misinformed her about the assets of the estate, . . . and he did not provide her with information about the Trust Agreement and [Delbert's] exercise (or attempted exercise) of his power of appointment.

. . . . During the course of the [LeTourneau] litigation, the attorney for Michael and Michele discovered that assets that should have gone to Michael and to the estate of [Delbert] were transferred instead to the scholarship trust. . . . During that [LeTourneau] litigation, . . . Defendant Boon gave a deposition in August 2012. He testified Defendant Stringer . . . had made a mistake in assigning to the scholarship trust the $20,954.00 in property that had been earmarked for Trust A. But he curiously refused to admit that a mistake was made in assigning to the scholarship trust the $188,585.00 in property that had been earmarked for Trust C because he had always been concerned about the validity of [Delbert's] power of appointment, though he had never communicated this concern to [Delbert], Mrs. Bengel, or anyone else. This testimony either is a breach of Defendant

---

[4]Section 2056(b)(7) of the Internal Revenue Code, generally known as a QTIP trust, provides that a qualified terminable interest property in which the surviving spouse has a qualifying income interest for life shall be treated as passing to the surviving spouse. I.R.C. § 2056(b)(7)(A), (B)(i) (West, Westlaw current through P.L. 113-185 approved Oct. 6, 2014). A surviving spouse has a qualifying income interest for life if the surviving spouse is entitled to all the income from the property, payable annually or at more frequent intervals, and no person has a power to appoint any part of the property to any person other than the surviving spouse. I.R.C. § 2056(b)(7)(A), (B)(ii) (West, Westlaw current through P.L. 113-185 approved Oct. 6, 2014). This does not apply to a power exercisable only at or after the death of the surviving spouse. I.R.C. § 2056(b)(7)(A), (B)(ii)(II).

Boon's fiduciary duty to [Delbert], his estate, and/or the personal administrators of his estate because it is false or reveals that Defendant Boon breached his fiduciary duty to [Delbert] and Mrs. Bengel by not informing them of his concerns about the validity of the general power of appointment. . . .

. . . .

. . . [D]ue to the negligence of Defendants Boon, [and] Stringer . . . , assets that should have gone to Michael and the estate of [Delbert] went instead to the scholarship trust.

Damages sought by Wendolyn included "the value of the property that went to the scholarship trust but which should have gone to the estate of [Delbert]" and forfeiture of attorney fees that had been paid to Boon. The matters related to Stringer were subsequently settled.

### F. The Summary Judgment Arguments

In response to the petition, Boon moved for summary judgment on the grounds that (1) the claims were malpractice claims subject to the two-year statute of limitations, (2) Wendolyn could not sue Boon for malpractice because there was no privity between Wendolyn and Boon, (3) the claims were barred by the statute of limitations, (4) the claims against Boon were previously released in the LeTourneau Settlement and distribution of assets, (5) the will's hold harmless clause barred claims against Boon, and (6) there was no damage to Delbert's estate or to the beneficiaries due to the LeTourneau Settlement. In addition to this traditional motion for summary judgment, Boon filed a no-evidence motion for summary judgment arguing that there was no evidence of either the standard of care or breach to support the negligence claim.

In response to Boon's motion for summary judgment, Wendolyn argued (1) that the claims for breach of fiduciary duty were separate and apart from the negligence claims (2) that

12

privity was not necessary since she was suing on behalf of both the estate and Bengel, (3) that the discovery rule saved the claims from limitations, (4) that the releases executed in 2006 by the beneficiaries and the LeTourneu Settlement did not apply since (a) Wendolyn was not suing on behalf of the beneficiaries, (b) no representative of Delbert's estate was identified as a releasing party, and (c) the Masonic Lodge was not a party to the Settlement, (5) that the will's hold-harmless clause did not relieve Boon from liability, and (6) that there was damage to the estate because (a) it was seeking $209,540.00 (the amount that should have been in Trust A and Trust C), and only $205,000.00, which included settlement over the mineral interests, was paid to the LeTourneau Defendants, and (b) she was also seeking fee forfeiture. In response to the no-evidence motion for summary judgment, Wendolyn stated that Boon's 2012 deposition provided the standard of care and admitted the breach.

After reviewing the summary judgment evidence, the trial court granted Boon's traditional motion for summary judgment and entered a take-nothing judgment in Boon's favor.[5] Wendolyn appeals.

## II. Standard of Review

We review the grant of a motion for summary judgment de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). "The party moving for traditional summary judgment bears the burden of showing no genuine issue of material fact exists and it is entitled to judgment as a matter of law." *Id*. (citing Tex. R. Civ. P. 166a(c)). We review the summary judgment evidence in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors

---

[5]The trial court did not consider Boon's no-evidence motion for summary judgment.

could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 208 (Tex. 2002).

## III.  Analysis of the Issues

### A.  The Claims Against Boon Are Legal Malpractice Claims

The petition filed by Wendolyn raises negligence and breach of fiduciary duty claims. "'Legal malpractice is not the only cause of action under which a client can recover from [its] attorney.'" *Isaacs v. Schleier*, 356 S.W.3d 548, 555 (Tex. App.—Texarkana 2011, pet. denied) (quoting *Goffney v. Rabson*, 56 S.W.3d 186, 190 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)).  "'When the facts of a case support claims against a lawyer for something other than professional negligence,'" the claims may be allowed.  *Isaacs*, 356 S.W.3d at 555–56 (quoting *Murphy v. Gruber*, 241 S.W.3d 689, 695 (Tex. App.—Dallas 2007, pet. denied)).  However, unless the claim cannot be characterized as advice, judgment, or opinion arising from the attorney-client relationship, the cause of action is for malpractice.  *Isaacs*, 356 S.W.3d at 556 (citing *Brescia v. Slack & Davis, L.L.P.*, No. 03-08-00042-CV, 2010 WL 4670322, at *7 (Tex. App.—Austin Nov. 19, 2010, pet. denied) (mem. op.)).

This is because "'Texas law . . . does not permit a plaintiff to divide or fracture her legal malpractice claims into additional causes of action.'"  *Isaacs*, 356 S.W.3d at 556 (quoting *Goffney*, 56 S.W.3d at 190) (citing *Greathouse v. McConnell*, 982 S.W.2d 165, 172 (Tex. App.—Houston [1st Dist.] 1998, pet. denied); *Smith v. Heard*, 980 S.W.2d 693, 697 (Tex. App.—San Antonio 1998, pet. denied); *Kahlig v. Boyd*, 980 S.W.2d 685, 688–91 (Tex. App.—San Antonio 1998, pet. denied); *Rodriguez v. Klein*, 960 S.W.2d 179, 184 (Tex. App.—Corpus Christi 1997,

14

no pet.); *Judwin Props., Inc. v. Griggs & Harrison*, 911 S.W.2d 498, 506 (Tex. App.—Houston [1st Dist.] 1995, no writ); *Am. Med. Elecs., Inc. v. Korn*, 819 S.W.2d 573, 576 (Tex. App.—Dallas 1991, writ denied); *Bray v. Jordan*, 796 S.W.2d 296, 298 (Tex. App.—El Paso 1990, no writ)).

> Therefore, in general, courts do not allow a case arising out of an attorney's alleged bad legal advice or improper representation to be split out into separate claims for negligence, breach of contract, or fraud, because the "real issue remains one of whether the professional exercised that degree of care, skill, and diligence that professionals of ordinary skill and knowledge commonly possess and exercise."

*Isaacs*, 356 S.W.3d at 556 (quoting *Kimleco Petroleum, Inc. v. Morrison & Shelton*, 91 S.W.3d 921, 924 (Tex. App.—Fort Worth 2003, pet. denied)).

Wendolyn argues that the deposition Boon gave in the LeTourneau lawsuit demonstrates that the claims are not for legal malpractice because it shows that he willfully failed to disclose his uncertainty over the issue of whether Delbert possessed a general power of appointment over the assets of Trust C. During the deposition, Boon made the following statements:

> Q.     And so, after you had all of these conversations with Delbert Messner about the trust agreement, about not wanting to give to LeTourneau and he wanted to revoke Trust A and withdraw rights under the other two trusts, is this one of the things that you prepared for him based on his desires and wishes?
>
> A.     Yes.
>
> Q.     And could you especially look at anything to do with the general power of appointment under Trust C?
>
> A.     Yes.
>
> Q.     So, when you prepared that document, what were you doing for Mr. Messner as to the general power of appointment under Trust C?

15

A.     I was attempting -- if he had the power of appointment, I was attempting to exercise it.

Q.     All right.  Well, why do you say if he had it?

A.     I'd never seen one quite like this.  I've written many general powers of appointment and read many general powers of appointment.  Normally, you'll see the provision that will say when the person passes away, they have a general power of appointment exercisable in favor of their estate or creditors of their estate.  I'd not seen one like this.
I did go and review the co-provisions talking about and determined that he certainly if he had the power, he wanted to exercise it; so, that's what I did.

Q.     So, do you remember actually telling Delbert Messner that you may not have this power or I don't know if you have it or not?

A.     I do not remember telling him that, no.

. . . .

Q.     But, I mean, do you know of any reason why the power in that will was not valid and effective?

A.     No, I don't; but I had never seen one quite like this before.

Q.     What concerns do you now have for you to say if --

A.     I don't have any concerns now.

Q.     -- for you to say if it's valid.  "If he had it," what do you mean by "if he had it"?

A.     Well, I guess that's the whole crux of this lawsuit, did he have the power of appointment.  I thought he did or I wouldn't have -- you know, and obviously the provision is in the trust agreement; so, that's why I put it in there.  But I don't know if it's a slam-dunk case, but I wouldn't have put it in there if I thought it was illegal to put the provision in the will.

Q.     Right. But let me ask you though, . . . [i]s there anything in your mind for you to say "if he had it"?

A.     Nothing has come from talking to lawyers subsequent.  I guess -- again, I'd just never seen this provision before . . . .

16

. . . .

> Q.    Is there any reason in your mind to believe that 2056(b)(5) would not be legal or proper or able to be exercised by Delbert Messner?
>
> A.    No, there's not.

However, as Boon's examination continued, he wavered and ultimately admitted that he was unsure one way or the other whether the Trust C general power of appointment was valid.

The crux of a breach of fiduciary duty cause of action is different from that of legal malpractice. *Isaacs*, 356 S.W.3d at 559. "The focus of breach of fiduciary duty is whether an attorney obtained an improper benefit from representing a client, while the focus of a legal malpractice claim is whether an attorney adequately represented a client." *Id.* Whereas, "[a] cause of action for legal malpractice arises from an attorney giving a client bad legal advice or otherwise improperly representing the client,"

> [a] breach of fiduciary duty occurs when an attorney benefits improperly from the attorney-client relationship by, among other things, subordinating his client's interests to his own, retaining the client's funds, using the client's confidences improperly, taking advantage of the client's trust, engaging in self-dealing, or making misrepresentations.

*Id.* The petition filed by Wendolyn complains of Boon's alleged failure to disclose his struggle with the legal interpretation of a trust provision drafted by another attorney and with his negligence in overlooking the fact that Trust A and Trust C assets had not been properly allocated. As we previously explained in *Isaacs*, without more, the petition does not "allege the type of dishonesty or intentional deception that will support a breach-of-fiduciary-duty claim." *Id.* Neither does the petition establish a negligence claim separate and apart from a legal malpractice claim.

17

We conclude that the trial court properly determined that the claims against Boon were legal malpractice claims. Thus, they were subject to the two-year statute of limitations. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a) (West Supp. 2014).

**B.     Privity: Wendolyn Could Raise Claims on Behalf of the Estate, but Could Not Raise Claims Personal to Bengel**

"Legal malpractice claims sound in tort." *Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 783 (Tex. 2006). "The plaintiff must demonstrate 'that (1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the breach proximately caused the plaintiff's injuries, and (4) damages occurred.'" *Id.* (quoting *Peeler v. Hughes & Luce*, 909 S.W.2d 494, 496 (Tex. 1995)). Boon argues that he owed no duty to Wendolyn.

"While an attorney always owes a duty of care to a client, no such duty is owed to non-client beneficiaries, even if they are damaged by the attorney's malpractice." *Id.* (quoting *Barcelo v. Elliott*, 923 S.W.2d 575, 577 (Tex. 1996)). "Without this 'privity barrier,' the rationale goes, clients would lose control over the attorney-client relationship, and attorneys would be subject to almost unlimited liability." *Barcelo v. Elliott*, 923 S.W.2d 575, 577 (Tex. 1996). "Texas courts of appeals have uniformly applied the privity barrier in the estate planning context." *Id.*; *see also Huie v. DeShazo*, 922 S.W.2d 920, 921 (Tex. 1996) (orig. proceeding) (holding that because trustee was client of attorney, beneficiary could not discover communications between trustee and attorney otherwise protected by attorney-client privilege).

Boon argues that he cannot be liable to Wendolyn because she is a non-client. For support, he cites to *Barcelo*. *See Barcelo*, 923 S.W.2d at 577. That case involved suit filed by beneficiaries for services that were provided to the testator of a will and settlor of a trust. *Id.* at

18

576. There, the Texas Supreme Court rejected the invitation to create an exception to the privity barrier. The court reasoned that allowing an exception to the privity barrier in such a circumstance would lead to "inevitable problems with disappointed heirs attempting to prove that the defendant-attorney failed to implement the deceased testator's intentions . . . [by] extrinsic evidence." *Id.* at 578.

Wendolyn argues that *Barcelo* does not apply. She refers to the rule in *Smith v. O'Donnell*, 288 S.W.3d 417, 419 (Tex. 2009), which found that the executor of a decedent's estate could bring the decedent's survivable malpractice claims on behalf of his estate for legal malpractice arising from advice given to the decedent while the decedent was serving as the executor of his wife's estate because "[a]n executor is a personal representative who 'stands in the shoes' of the decedent." *Id.* at 421 (quoting *Belt*, 192 S.W.3d at 787). *Smith* reasoned, "[t]he threat of executor lawsuits will not impede the attorney-client relationship, because the estate's suit is based on injury to the deceased client, as opposed to any third party. The estate's suit is identical to one the client could have brought during his lifetime." Based on *Smith*, we find that Wendolyn properly brought claims for legal malpractice arising out of advice Boon gave to Delbert when he was acting as the administrator of Barbara's estate. Thus, the alleged claim for Boon's failure to disclose his belief that Trust C may not have contained a viable general power of appointment was properly brought by Wendolyn.

Wendolyn also argues that she could bring claims for legal malpractice arising out of Boon's representation of Bengel because she stepped into Bengel's shoes as the successor personal representative. Wendolyn looks to *Belt* for support. In *Belt*, the court was asked to determine whether *Barcelo* barred a personal representative of the estate, as opposed to estate

19

beneficiaries, from bringing legal malpractice claims on behalf of decedent's estate. *Belt*, 192 S.W.3d at 783. Reasoning (1) that a claim for malpractice in planning an estate can accrue prior to death even though the damage might not be realized until after a death and (2) that a personal representative steps into the shoes of the decedent, *Belt* found that the personal representatives could bring the decedent's claims for legal malpractice. *Id.* at 786–87. *Belt* did not answer the question of whether a successor personal representative can bring legal malpractice claims arising from advice given to a previous personal representative. Instead, it stands for the idea that Wendolyn could also bring Delbert's claims for legal malpractice arising out of Boon's estate planning advice.

In discussing *Belt*, *Smith* reflected, "The threat of executor lawsuits will not impede the attorney-client relationship, because the estate's suit is based on injury to the deceased client, as opposed to any third party . . . [and] is identical to the one the client could have brought during his lifetime." *Smith*, 288 S.W.3d at 421. Here, claims alleging that Boon failed to properly advise Bengel in her role as administrator of Delbert's estate are not based on injury to Delbert and could not have been brought by Delbert during his lifetime. Instead, the injury, if any, was to Bengel. Because Bengel is deceased, claims of malpractice with respect to advice Bengel received belonged to her estate, which is not involved in this litigation.[6]

The privity barrier is the general rule, and the exceptions crafted by *Belt* and *Smith* do not fit the situation before us. Moreover, legal malpractice claims are not assignable. *Vinson &*

---

[6]The role of an executrix and her attorney should not be blurred. *See Lesikar v. Rappeport*, 33 S.W.3d 282, 320 (Tex. App.—Texarkana 2000, pet. denied). "The executrix's duty is to prosecute claims on behalf of the estate; the attorney's duty is to give the executrix candid legal advice." *Id.* Separate recourse is available for an executrix' mismanagement of her responsibilities. Given the 2006 releases and lack of action against Bengel, it is difficult to imagine how Bengel was actually harmed by the advice Boon gave to her. Thus, it appears that other grounds raised by Boon supported the trial court's grant of summary judgment on claims Wendolyn raised involving Boon's representation of Bengel.

20

*Elkins v. Moran*, 946 S.W.2d 381, 389–90 (Tex. App.—Houston [14th Dist.] 1997, writ dism'd); *see Magill v. Watson*, 409 S.W.3d 673 (Tex. App.—Houston [1st Dist.] 2013, no pet.). We find that although Wendolyn had the right to bring Delbert's legal malpractice claims in her capacity as the representative of Delbert's estate, she did not possess the power to bring claims for legal malpractice on behalf of Bengel.

### C.    Limitations

Boon argues that in any case, the claims against him are barred by the two-year statute of limitations. "'A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense.'" *Estate of Jobe v. Berry*, 428 S.W.3d 888, 897 (Tex. App.—Texarkana 2014, no pet.) (quoting *Friddle v. Fisher*, 378 S.W.3d 475, 483 (Tex. App.—Texarkana 2012, pet. denied)). Wendolyn seeks to apply the discovery rule. Thus, Boon was required to "'(1) conclusively prove that the cause of action accrued before the commencement of the statute of limitations period,'" and "'(2) negate the discovery rule . . . by proving as a matter of law that there [was] no genuine issue of material fact about when [Delbert or Bengel, as the previous administrator of Delbert's estate] discovered, or in the exercise of reasonable diligence should have discovered[,] the nature of [the] injury.'" *Id.* (quoting *Friddle*, 378 S.W.3d at 483). If Boon did not conclusively prove these matters, then "'a fact question exists about when the limitations period began to accrue.'" *Id.* (quoting *Isaacs*, 356 S.W.3d at 562. However, if Boon established that the statute of limitations barred the action, it was left to Wendolyn to "'then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations.'" *Id.* (quoting *Friddle*, 378 S.W.3d at 483).

21

"Generally, when a cause of action accrues is a question of law." *Jobe*, 428 S.W.3d at 898 (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003)). "'[A] cause of action accrues and the statute of limitations begins to run when facts come into existence that authorize a party to seek a judicial remedy.'" *Id.* (quoting *Knott*, 128 S.W.3d at 221). "'In most cases, a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur.'" *Id.* (quoting *Knott*, 128 S.W.3d at 221). Suit must generally be filed within the limitations period. However, as an exception to this general rule, "'Texas applies the discovery rule to legal malpractice claims'" because an attorney's client is not expected to have sufficient legal acumen to perceive injury at the time an omission is made by her attorney. *Id.* (quoting *Isaacs*, 356 S.W.3d at 560).

It is undisputed that prior to the LeTourneau lawsuit, Boon failed to disclose to anyone any discomfort that he might have had with whether Delbert had a general power of appointment over Trust C. According to the petition, Boon's failure to disclose his concern led Delbert to execute a will that, according to Boon's 2012 deposition, may or may not have exercised the general power of appointment and resulted in claims that had to be litigated in the LeTourneau lawsuit.

The primary thing needing determination is that of defining when Delbert (or someone else, acting on behalf of the estate) discovered the alleged malpractice. Boon argues that the estate's claims should have been discovered in 2006 because (1) the 2005 accounting showed that funds were being held in a scholarship trust, (2) all of the beneficiaries acknowledged receipt of the accounting in the 2006 releases, and (3) Bengel discovered in 2006 that Barbara's

22

additional mineral interests had not been accounted for. However, even though Boon testified that he reviewed the 2005 accounting and that the accounting was available to the beneficiaries at Stringer's office, he stated in his 2012 deposition that he did not realize that trust assets had been misallocated until after Bengel's death. In fact, Boon testified that Bengel herself wrote a check to the University for Trust C assets and that Boon prepared a receipt and release to be signed by the University.[7]

Boon also admitted that although he sent Bengel a copy of his letter to Hughey in 2006, he did not otherwise speak to Bengel about the newly discovered mineral interests. The 2006 letter to Hughey merely stated that "the trust of which you are the trustee was the ultimate owner" of the mineral interests, without referencing which trust was the "owner," suggesting the possibility that the scholarship trust owned the assets. Thus, it appears that injury resulting to the estate arising from Boon's alleged malpractice in advising Delbert, if any, had not been realized until the LeTourneau lawsuit. Further, there is no evidence in the record that any personal representative was representing Delbert's estate during the pendency of the LeTourneau lawsuit.

Based on the facts of this case, we cannot conclude that Boon conclusively established his entitlement to summary judgment on the ground of limitations as a matter of law.

### D. The 2006 Releases and the LeTourneau Settlement

Next, Boon argues that both the 2006 releases and the Settlement bar the estate's claims. Wendolyn argues that the 2006 releases (1) only exculpated the estate and its personal representatives from causes of action filed by the beneficiaries of Delbert's estate, (2) do not apply to causes of action filed on behalf of the estate, and (3) could not have released a cause of

---

[7]Because the assets were held in trust, Boon stated that the inventory he prepared on Bengel's behalf included no Trust C assets.

23

action that was not discovered until 2012. She further argues that the Settlement does not bar the estate's claims because no personal representative was made a party to the LeTourneau lawsuit.

"A release is a contractual arrangement that operates as a complete bar to any later action based upon matters covered in the release." *Naik v. Naik*, 438 S.W.3d 166, 174 (Tex. App.—Dallas 2014, no pet.). "A release is subject to the rules of contract construction," which are well established. *Id.* Here, the 2006 releases "RELEASE[] AND FULLY ACQUIT[] the estate and all persons acting for or on behalf of the estate." There is nothing in the record showing that Boon, who represented Bengel, was also representing the estate in the LeTourneau lawsuit or that he was otherwise intended to benefit from or entitled to enforce the release. Further, the release establishes the beneficiaries (not the estate) as the parties giving a release of further potential claims.

Boon argues that the LeTourneau lawsuit asserted claims against all of Delbert's beneficiaries and that those beneficiaries filed counterclaims that were settled. The estate was not included as a party to the LeTourneau lawsuit because "[i]t has long been settled that the 'estate' of a decedent is not a legal entity and may not sue or be sued as such." *Miller v. Estate of Self*, 113 S.W.3d 554, 556 (Tex. App.—Texarkana 2003, no pet.) (citing *Price v. Estate of Anderson*, 522 S.W.2d 690, 691 (Tex. 1975)). While the general rule is that "suit seeking to establish the liability of an estate should be filed against the personal representative," suit may be filed "in certain circumstances, [against] the heirs or beneficiaries." *Id.*

The 2006 releases from Delbert's beneficiaries acknowledged that Bengel had "taken care of and managed this estate in compliance with the standards of the Texas Probate Code" and that she had the right to seek judicial discharge "pursuant to the provisions of Section 149D

24

through G of the Texas Probate Code,"[8] now contained in Section 405.003 of the Texas Estate Code. Under those sections, judicial discharge would be available only after Bengel had marshaled all the assets and paid all of the debts of the estate.[9] Because judicial discharge would only be available if there was no further need for independent administration, the releases were intended to discharge Bengel from further service and duty as a fiduciary. *See In re Estate of Whittington*, 409 S.W.3d 666, 671 (Tex. App.—Eastland 2013, no pet.) (discussing that Section 149E terminates the administration). "When there is no duly appointed executor, the proper parties are the heirs or beneficiaries of the estate." *Id.*

It is true that after Bengel's death, no one was appointed to serve as the estate's personal representative. However, (1) Bengel did not obtain a judicial discharge, (2) there is no evidence in the record showing that the administration was closed pursuant to Section 151 of the Texas Probate Code,[10] (3) Boon was never included as a party to the LeTourneau lawsuit, (4) there is no evidence that the LeTourneau Defendants were sued in a capacity that would include the estate as a party, and (5) there is no argument that the LeTourneau Defendants' claims against

---

[8]Act of May 27, 1999, 76th Leg., R.S., ch. 855, § 6, sec. 149D, 1999 Tex. Gen. Laws 3527, 3528 (West), *repealed by* Act of May 29, 2011, 82d Leg., R.S., ch. 1338, § 2.54(d)(2), 2011 Tex. Sess. Law Serv. 3884, 3935 (West); *see* TEX. ESTATES CODE ANN. § 405.003 (West 2014).

[9]Act of May 27, 1999, 76th Leg., R.S., ch. 855, § 6, sec. 149D, 149E, 1999 Tex. Sess. Law Serv. 3527, 3528 (West), *repealed by* Act of May 29, 2011, 82d Leg., R.S., ch. 1338, § 2.54(d)(2), 2011 Tex. Sess. Law Serv. 3884, 3935 (West); *see* TEX. ESTATES CODE ANN. § 405.003 (West 2014).

[10]The Texas Probate Code, 54th Leg., R.S., ch. 55, § 1, sec. 151, 1955 Tex. Gen. Laws 88, 137, *amended by* Act of May 17, 1979, 66th Leg., R.S., ch. 713, § 21, 1979 Tex. Gen. Laws 1740, 1752, *amended by* Act of May 24, 1991, 72d Leg., R.S., ch. 895, § 11, 1991 Tex. Gen. Laws 3062, 3067, *amended by* Act of May 24, 1995, 74th Leg., R.S., ch. 642, § 5, 1995 Tex. Gen. Laws 3516, 3518, *Subsection (e) repealed by* Act of May 15, 2007, 80th Leg., R.S., ch. 302, § 7(1), 2007 Tex. Gen. Laws 575, 577, *amended by* Act of May 29, 2011, 82d Leg., R.S., ch. 1338, § 1.26, 2011 Tex. Sess. Law Serv. 3884, 2897 (West), *repealed by* Act of May 29, 2011, 82d Leg., R.S., ch. 1338, § 2.54(d)(1), 2011 Tex. Sess. Law Serv. 3884, 3935 (West); *see* TEX. ESTATES CODE ANN. §§ 405.002, .004–.007 (West 2014).

Boon would have been compulsory counterclaims in the LeTourneau lawsuit.[11]  Further, it is uncontested that at least one beneficiary never appeared in the LeTourneau lawsuit and did not execute the Settlement.

"A tortfeasor can claim the protection of a release only if the release refers to him by name or with such descriptive particularity that his identity or his connection with the tortious event is not in doubt."  *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 420 (1984).  The broad language of the Settlement does not save Boon since (1) it stated that it applied only to "part[ies] to this agreement, together with their agents, representatives . . . [and] attorneys," (2) there is no evidence that Boon was an agent, representative, or attorney for any party in the LeTourneau lawsuit, and (3) the Settlement also plainly stated, "Nothing in this [Settlement] shall be construed to prejudice any claims or defenses of the Parties against any persons or entities that are not parties to this Agreement."

We find that neither the 2006 releases nor the Settlement barred the estate's legal malpractice claim.

### E.     The Exculpatory Clause

Boon argues that there is an exculpatory provision in Delbert's will that bars the estate's legal malpractice claim.  This clause states,

> Any Executor or Trustee may rely in good faith upon the written opinion of any attorney, any facts stated in any instrument in writing and believed true or any other evidence deemed sufficient.  Any Executor or Trustee shall be saved harmless from any liability for any action such Executor or Trustee may take, or

---

[11]If Boon had been made a party to the LeTourneau lawsuit, it is possible that the LeTourneau Defendants would be placed in the position of arguing both (1) that the general power of appointment was valid and that they were entitled to all of the Trust A and Trust C assets and (2) that general power of appointment was invalid and they were entitled to recover from Boon.

26

for the failure of such Executor or Trustee to take any action, if done in good faith and without gross negligence.

"Texas requires that the exculpatory language be unequivocal." *Mostek Corp. v. Chemetron Corp.*, 642 S.W.2d 20, 26 (Tex. App.—Dallas 1982, writ dism'd). The exculpatory agreement clearly bars any action against Bengel. Boon argues that the exculpatory clause inured to his benefit for advice he gave to Bengel. We need not address this argument since we have previously determined that lack of privity bars any legal malpractice claim that Bengel would have. However, there is nothing in this exculpatory provision that prevents the estate from taking action for legal malpractice claims held by Delbert. Thus, we find that the exculpatory provision does not apply to claims arising from Boon's representation in assisting Delbert with handling Barbara's estate or in preparing Delbert's will.

## F.    Damages to the Estate

Finally, Boon argues that due to the releases executed in 2006 and the Settlement, he has conclusively proved that the estate can show no damage resulting from any alleged malpractice. If a defendant conclusively negates one of the essential elements of a cause of action, then the defendant is entitled to summary judgment as to that cause of action. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995); *Davis v. Ed. Serv. Ctr.*, 62 S.W.3d 890, 893 (Tex. App.—Texarkana 2001, no pet.). The burden does not shift to the plaintiff to present evidence that creates a fact issue on the challenged essential element until the defendant produces evidence entitling it to summary judgment.[12] *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996).

---

[12]In addition to Boon's testimony, the summary judgment record contained the expert report of Ronald R. Cresswell, a board-certified estate planning and probate law attorney that has practiced for over forty-two years. As the final

Boon seeks to apply the "one satisfaction" rule. "Under the one satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered." *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000) (citing *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991)). "This rule applies when multiple defendants commit the same act as well as when defendants commit technically different acts that result in a single injury." *Id.* "The one satisfaction rule is grounds for granting summary judgment when (1) the one satisfaction rule applies, (2) the credit sought by the defendant entirely sets off the maximum compensatory liability claimed by the plaintiff, and (3) punitive damages are not at issue." *Brewer & Pritchard, P.C. v. AMKO Res. Int'l, L.L.C.*, No. 14-13-00113-CV, 2014 WL 3512836, at *2 (Tex. App.—Houston [14th Dist.] Jul. 15, 2014, no pet.) (mem. op.) (citing *Cohen v. Arthur Andersen, L.L.P.*, 106 S.W.3d 304, 309–10 (Tex. App.—Houston [1st Dist.] 2003, no pet.)). The goal of the one satisfaction rule is to prevent a double recovery.

Yet,

> [w]here the tortious acts of two or more wrongdoers join to produce an indivisible injury, that is, an injury which from its nature cannot be apportioned with reasonable certainty to the individual wrongdoers, all of the wrongdoers will be held jointly and severally liable for the entire damages and the injured party may proceed to judgment against any one separately or against all in one suit.

*Landers v. E. Tex. Salt Water Disposal Co.*, 248 S.W.2d 731, 734 (Tex. 1952); s*ee Krobar Drilling, L.L.C. v. Ormiston*, 426 S.W.3d 107, 112 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). Assuming, without deciding, that the one satisfaction rule applies, the allegations

---

judgment in the LeTourneau lawsuit held, Cresswell's report stated that there was a general power of appointment in Trust C and that "Delbert executed a Last Will and Testament, which clearly exercised the general power of appointment." Because the trial court failed to rule on Boon's no-evidence motion for summary judgment, we express no opinion on the argument that Wendolyn had no evidence of breach of a duty owed to Delbert.

against Hughey and March in the LeTourneau lawsuit and the allegation against Boon resulted in the same injury—misallocation of funds in Trust A and Trust C to the University.

However, the one satisfaction rule "'prevents a claimant from recovering more than the amount required for full satisfaction of his damages.'" *Brewer*, 2014 WL 3512836, at *6 (quoting *El Paso Natural Gas Co. v. Berryman*, 858 S.W.2d 362, 364 (Tex. 1993) (per curiam). Because Boon is asserting that the Settlement in the LeTourneau lawsuit satisfied the estate's claim for damages, he "must prove as a matter of law that [he is] entitled to a credit equaling the entire amount" included in the Settlement. *Id.* (citing *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex. 1998); *Cohen*, 106 S.W.3d at 310). Here, the $205,000.00 Settlement did not fully satisfy the estate's claim for $209,540.00—the fully added value of Trust A and Trust C. Moreover, the estate seeks fee forfeiture.[13] Thus, Boon has not conclusively negated the damage element of the estate's malpractice claims.[14]

We find that with respect to the claims Wendolyn asserted on Delbert's behalf, Boon has failed to establish his entitlement to a traditional summary judgment as a matter of law.

## IV. Conclusion

We affirm the trial court's summary judgment in favor of Boon with respect to claims relating to damages allegedly suffered by Bengel. However, we reverse the trial court's summary judgment dismissing the claims by Wendolyn in her capacity as the personal

---

[13]*See Burrow v. Arce*, 997 S.W.2d 229, 238 (Tex. 1999) (holing that actual damages need not be shown prior to entitlement to fee forfeiture).

[14]Boon also argues that the beneficiaries of Delbert's estate are barred from seeking additional amounts under the estate due to the 2006 releases. That matter is to be handled by the estate at another time.

representative of Delbert's estate against Boon and remand those claims to the trial court for further proceedings consistent with this opinion.

Bailey C. Moseley
Justice

Date Submitted:  October 22, 2014
Date Decided:  January 28, 2015